**William DAYE, Petitioner-Appellant,**

v.

**ATTORNEY GENERAL OF the STATE OF NEW YORK and Eugene S. Le-Fevre, Superintendent, Clinton Correctional Facility, Respondents-Appellees.**

**No. 906, Docket 80–2292.**

United States Court of Appeals, Second Circuit.

Argued March 20, 1981.

Decided Oct. 28, 1981.

**1156**

Phylis Skloot Bamberger, The Legal Aid Society, Federal Defender Services Unit, New York City, for petitioner-appellant.

Meredith Anne Feinman, Asst. Dist. Atty., New York City (Robert M. Morganthau, Dist. Atty. of New York County, Norman Barclay, Asst. Dist. Atty., New York City, on the brief), for respondents-appellees.

Before LUMBARD and NEWMAN, Circuit Judges, and METZNER,* District Judge.

NEWMAN, Circuit Judge:

William Daye appeals from a judgment of the District Court for the Southern District of New York (Milton Pollack, Judge), dismissing on the merits his petition for habeas corpus challenging the validity of his state court conviction for murder, robbery, and related crimes. We affirm the dismissal without prejudice solely on the ground that state court remedies have not been exhausted. 28 U.S.C. § 2254(b) (1976).

Daye was convicted on June 26, 1976 after a jury trial in the Supreme Court, New York County (Burton Roberts, Judge), of intentional murder, felony murder, and two counts of robbery in the first degree. He was sentenced to concurrent terms of imprisonment of 20 years to life on each murder conviction and 8⅓ to 25 years on each robbery conviction. He appealed to the Appellate Division, First Department, alleging primarily that the trial judge's excessive and prejudicial questioning had denied him a fair trial and, in addition, that he had been improperly impeached by evidence of a prior conviction on which he had been adjudicated a youthful offender. The Appellate Division affirmed without opinion, and

leave to appeal to the New York Court of Appeals was denied.

In determining whether Daye had exhausted state court remedies, Judge Pollack examined Daye's brief in the Appellate Division. See *Twitty v. Smith*, 614 F.2d 325, 331–32 n.7 (2d Cir. 1979). The District Court acknowledged that Daye had made no express reference to a denial of federal constitutional rights nor cited any federal cases. But, Judge Pollack noted, the state court brief had repeatedly argued that the trial judge's questioning "deprived the defendant of a fair trial" and deprived him of his "fundamental right to a fair trial." The District Court concluded that these references must have alerted the Appellate Division to the unstated basis of Daye's claim—that he had been denied a fair and impartial trial in violation of rights secured by the Sixth and Fourteenth Amendments. Judge Pollack relied on *Twitty v. Smith, supra,* 614 F.2d at 332, in which this Court ruled that reference in an Appellate Division brief to lack of "effective assistance of counsel" sufficed for purposes of exhaustion to tender to the state court an implicit claim that the defendant had been denied his Sixth Amendment right "to have the Assistance of Counsel for his defense." Turning to the merits, Judge Pollack concluded that the state trial judge's role had been "active" but not prejudicial and that the cross-examination of the accused involved no error of constitutional dimension.

This Court has frequently ruled that the exhaustion requirement is not satisfied unless the habeas petitioner explicitly refers to a federal constitutional standard in presenting his claim to the state courts. *Wilson v. Fogg,* 571 F.2d 91 (2d Cir. 1978); *Cameron v. Fastoff,* 543 F.2d 971 (2d Cir. 1976); *United States ex rel. Gibbs v. Zelker,* 496 F.2d 991 (2d Cir. 1974). We have especially emphasized the importance of identifying a claim as a federal constitutional claim when challenging the conduct of a state court trial judge. *Fielding v. Le-*

---

* The Honorable Charles M. Metzner of the United States District Court for the Southern District of New York, sitting by designation.

*Fevre*, 548 F.2d 1102 (2d Cir. 1977); *United States ex rel. Nelson v. Zelker*, 465 F.2d 1121 (2d Cir.), *cert. denied*, 409 U.S. 1045, 93 S.Ct. 544, 34 L.Ed.2d 497 (1972).

Just two years ago we applied this strict approach to exhaustion to a habeas corpus petition indistinguishable from Daye's. *Johnson v. Metz*, 609 F.2d 1052 (2d Cir. 1979). Like Daye, Johnson sought habeas corpus relief because of the excessive and prejudicial intervention of the state court trial judge, and, like Daye, his state court briefs, which made no express mention of the Sixth or Fourteenth Amendments, referred to the denial of a fair and impartial trial and characterized a fair trial as a fundamental element of the judicial process. Though the District Court in *Johnson* had concluded that the exhaustion requirement had been met and that the petitioner was entitled to relief on the merits, this Court reversed, ruling that Johnson had not presented a federal constitutional claim to the state courts. Even though Johnson's brief in the Appellate Division cited ten decisions of federal courts, his fair trial claim was deemed to be an appeal only to state law or to the supervisory power of the state appellate courts, and thus not the "same claim," *Picard v. Connor*, 404 U.S. 270, 276, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971), that he was presenting to the federal courts. *Johnson v. Metz, supra*, 609 F.2d at 1054.

*Twitty v. Smith, supra*, may be viewed as a slight relaxation of the strict requirement that exhaustion requires an explicit federal labeling of a state court appellant's claim; that decision, however, cannot justify overruling or ignoring *Johnson v. Metz, supra*. *Twitty* pointedly drew the distinction between the effective assistance of counsel claim in that case and the fair trial claim in *Johnson*, observing that the latter claim, because of its infrequent presentation as a federal constitutional claim, did not alert the state courts to its federal nature simply by reference to denial of a fair trial. *Twitty v. Smith, supra*, 614 F.2d at 332 n.8. With *Johnson* so recently decided and explicitly distinguished from *Twitty*, its precedential force must be recognized by this panel, unless and until its continuing validity is properly reexamined upon a rehearing *en banc*. *See Kremer v. Chemical Construction Corp.*, 623 F.2d 786, 788 (2d Cir. 1980).

There is surely room for fair argument whether a federal labeling requirement, as a component of exhausting state court remedies, serves either the interests of comity or justice. Evidence does not abound to indicate that state courts welcome the opportunity to give renewed consideration to a criminal conviction after the "federal" nature of a claim has been explicitly identified. Nor is there much reason to believe that the articulation of facts (here, excessive and prejudicial court questioning) and consequence (here, denial of a fair and impartial trial) are inadequate to afford state courts, fully aware of their constitutional responsibilities, a fair opportunity to decide whether a conviction accords with constitutional requirements. From the standpoint of the accused, it is obviously burdensome to be delayed two or three years in the presentation of what may be a successful challenge to a conviction, simply because of a pleading deficiency by his state court counsel. Moreover, strict adherence to a federal labeling requirement, after *Wainright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), runs the risk of placing the federal claim permanently beyond the possibility of vindication in the event that counsel's state court pleading deficiency is deemed a procedural forfeiture.

Some courts appear to have adopted a half-way approach, relaxing exhaustion requirements only when satisfied that the claim on the merits is unavailing. *See, e. g., Reese v. Bara*, 479 F.Supp. 651, 653 (S.D.N.Y.1979); *Boothe v. Wyrick*, 452 F.Supp. 1304, 1309 (W.D.Mo.1978); *Winegar v. Corrections Department*, 435 F.Supp. 285, 291 (W.D.Mich.1977), *aff'd without opinion*, 582 F.2d 1281 (6th Cir. 1978). While this technique conserves judicial resources, it is analytically unsound and creates the anomalous result that the better the petitioner's claim on the merits, the longer it will take him to have it vindicated.

Whatever our disagreements with an exhaustion requirement that entails explicit labeling of a federal claim, we are obliged to affirm this judgment without prejudice, solely on grounds of failure to exhaust state court remedies, and await a petition suggesting rehearing *en banc*, which we assume Daye will present.

METZNER, District Judge, concurring:

I would much have preferred to reach the merits on this appeal and affirmed the court below in dismissing the petition on the merits.

The record is complete as to the matters complained of by the petitioner. The parties have fully briefed and argued the merits. No issue or argument was presented to the District Court that was not before the state courts. It is my considered judgment, after reviewing the record, that petitioner was not deprived of a fair trial in violation of the Sixth and Fourteenth Amendments.

In such circumstances, the basis for the exhaustion rule is nonexistent. The doctrine is bottomed on the exercise of judicial restraint to avoid the friction created when a lower federal court upsets a state court conviction without the state court system first being given an opportunity to correct its own alleged constitutional errors. *Preiser v. Rodriguez*, 411 U.S. 475, 490, 93 S.Ct. 1827, 1836, 36 L.Ed.2d 439 (1973).

However, there is no possibility of offending the state court when federal review leaves the judgment of conviction untouched. Furthermore, the petitioner, represented here by able counsel, obviously assumes that state remedies have been exhausted and that relief can only be obtained in the federal court. The brief on appeal does not take issue with the holding of the court below that exhaustion has been satisfied. It only addresses the merits, and we have reviewed the merits on this appeal.

Consequently, in a case where the federal court cannot find a federal constitutional infirmity in the state court proceedings after full submission of the issue and review of the record, the petition should be dismissed on the merits. *Reese v. Bara*, 479

F.Supp. 657 (S.D.N.Y.1979). *See also* Shapiro, *Federal Habeas Corpus: A Study in Massachusetts*, 87 Harv.L.Rev. 321, 359 (1973).

Applying the exhaustion rule in this case creates at least a two-year delay in the ultimate disposition of the issue occasioned by a new round of collateral proceedings in the state and federal courts. Prompt disposition of criminal matters is in the best interest of the parties, the criminal justice system and society. I find no problem with adopting a rule which achieves this end in a case where the defendant has been properly convicted.

I must, however, concur in the result even though I find, on the facts of this case, that the exhaustion rule in this circuit exalts form over substance. The footnote in *Twitty v. Smith*, 614 F.2d 325, 332 n. 8 (2d Cir. 1979), distinguishing *Johnson v. Metz*, 609 F.2d 1052 (2d Cir. 1979), leaves the decision in *Johnson* the law applicable here. As Judge Newman points out, *Johnson v. Metz* may only be reexamined upon a rehearing *en banc.*

LUMBARD, Circuit Judge (dissenting):

I dissent. William Daye claims that he was denied a fair trial by reason of the trial judge's constant interruption of and participation in his trial for murder. The record indicates that he raised this claim in his state court appeals. Moreover, it is crystal clear that the claim made in the state courts asserted a violation of Daye's constitutional rights by reason of the state's failure to give Daye a fair trial. We should pass on the merits of that claim as did Judge Pollack in the district court. As a review of the record shows that Daye's claim is well founded, I would grant the petition for a writ of habeas corpus.

I.

In a five-count indictment, the state charged Daye with the armed robbery of the E & D Luncheonette at 144th Street and Seventh Avenue on March 19, 1974, and with the killing of the restaurant's cook, Isaac Stanback, in the course of the rob-

bery. His trial took place over two years later, and the jury convicted him of felony murder, intentional murder, and two counts of first degree armed robbery. The trial judge, the Honorable Burton B. Roberts, sentenced Daye to concurrent indeterminate terms of from 20 years to life for the murder convictions and to eight and one-third to 25 years for robbery.

At trial, the state produced fourteen witnesses, including six who were present in the E & D Luncheonette when William Daye entered. They testified that the cook, Isaac Stanback, was on the telephone at the rear of the luncheonette. Daye ordered Stanback to get off the phone and when he did not immediately do so, Daye put an automatic pistol to Stanback's side and fired it. The bullet went through Stanback and lodged in the ring finger of Daye's left hand. Daye then took Stanback's wallet and collected money from all the patrons and employees of the restaurant. In the course of the robbery, Daye aimed his gun at Dorothy Taylor, a co-owner of the luncheonette, and pulled the trigger; fortunately, the gun did not fire. Moments later, Daye held the pistol to a patron's head and tried to squeeze off a round and once again the gun jammed.

Having collected about $360, Daye ran out. Juanita Gibbs, one of the patrons who had been robbed, followed him and saw him enter a nearby apartment building at 160 West 142nd Street. She directed the police to the building where they began to search for the suspect. Detective Grant went to the roof and from there he saw Daye climb out of a third floor window and down a drainpipe. Grant ran downstairs, broke through a hall window on the landing, pulled Daye through the window, and arrested him. One of the robbery victims, David Miller, was waiting behind Grant on the landing, and he immediately identified Daye as the man who had terrorized the restaurant a few minutes earlier.

Although Daye had neither the gun nor any money on him when he was arrested, the evidence tying him to the crime was overwhelming. Besides Miller's on-the-spot identification, Daye's hand was still bleeding from the finger wound he suffered in the robbery, and Daye was dressed exactly as he had been in the restaurant, with one exception—the black corduroy jacket was missing. And Detective Leotta found this jacket in a fourth floor apartment at about the same time that Detective Grant spied Daye on the outside drainpipe. Moreover, the gun, a wallet taken from one of the patrons, and $36 in cash in a paper bag were all found in a third floor apartment of that same building within minutes of Daye's arrest. Immediately after Daye's arrest, a bullet which had been fired from the gun was removed from Daye's bleeding finger. Finally, in addition to the above testimony, four eyewitness-victims of the robbery positively identified Daye as their assailant.

In his defense, Daye testified that he was an innocent bystander and himself a victim. He said another man committed the robbery and fired the bullet that killed Stanback and hit Daye's hand. He said he ran away because he had been arrested before for being present when a crime had taken place and he was scared of the police. On his direct testimony Daye admitted to previous convictions for petit larceny and robbery.

Daye's conviction for intentional murder, felony murder and two counts of first degree robbery was unanimously affirmed without opinion by the Appellate Division in October 1979, *People v. Daye*, 72 A.D.2d 669, 421 N.Y.S.2d 955, and leave to appeal was denied the following month, 48 N.Y.2d 978, 425 N.Y.S.2d 1034, 401 N.E.2d 421. Daye's habeas corpus petition was filed in the Southern District in April, 1980, alleging, *inter alia*, that he had been deprived of a fair trial by the trial judge's repeated interruptions and interrogations of witnesses. The district court held first that Daye had exhausted his state remedies and so was entitled to seek habeas relief, and second that on the merits Daye was not entitled to the writ. In his opinion of June 6, 1980, Judge Pollack found that the trial judge's questioning, although extensive, was not prejudicial, but merely "aimed at

bringing out or clarifying the facts." He noted that on several occasions the trial judge instructed the jurors that his questions were not to be taken as an expression of an opinion on his part. After the district court denied a certificate of probable cause, this court granted a certificate and assigned counsel.

I agree with the district court that Daye's claim that he received an unfair trial in violation of his constitutional rights was raised on his appeal to the Appellate Division and that the petitioner thereby exhausted his remedies in the state courts. Daye's appeal brief repeatedly argued that the trial judge's questioning "deprived the defendant of his right to a fair trial." The New York courts have recognized that this right rests on constitutional and not merely state law grounds, *see, e. g., People v. Mees*, 47 N.Y.2d 997, 998, 420 N.Y.S.2d 214, 394 N.E.2d 283 (1979); *People v. De Jesus*, 42 N.Y.2d 519, 520, 523–24, 399 N.Y.S.2d 196, 369 N.E.2d 752 (1977); *People v. Crimmins*, 36 N.Y.2d 230, 237–38, 367 N.Y.S.2d 213, 326 N.E.2d 787 (1975), and Daye's citation of such cases was sufficient to alert the Appellate Division of his federal law claims. *See Twitty v. Smith*, 614 F.2d 325, 332–22 (2d Cir. 1979).

*Johnson v. Metz*, 609 F.2d 1052 (2d Cir. 1979), cited as controlling here by Judge Newman, is distinguishable. In *Johnson*, "the primary line of cases cited in support were state cases in which prejudicial conduct by trial judges resulted in reversal by the appellate courts of the state as a matter of state law or under their supervisory powers." 609 F.2d at 1054. Here, the leading case cited by Daye to the Appellate Division, *People v. De Jesus*, 42 N.Y.2d 519, 399 N.Y.S.2d 196, 369 N.E.2d 752 (1977), rested on both federal and state law. In *De Jesus*, the Court of Appeals reversed a criminal conviction for prejudicial conduct by the trial judge, citing the following United States Supreme Court cases in support of the principle that there is a fundamental, constitutional right to a fair trial, untainted by judicial partiality: *Sheppard v. Maxwell*, 384 U.S. 333, 350–51, 86 S.Ct. 1507, 1515–16, 16 L.Ed.2d 600 (1966); *Estes v. Texas*, 381 U.S. 532, 540–41, 85 S.Ct. 1628, 1631–32, 14 L.Ed.2d 543 (1965); *Turner v. Louisiana*, 379 U.S. 466, 472, 85 S.Ct. 546, 549, 13 L.Ed.2d 424 (1965); and *In re Oliver*, 333 U.S. 257, 278, 68 S.Ct. 499, 510, 92 L.Ed. 682 (1948). Moreover, the numerous prior appeals that the New York courts have heard claiming that Judge Roberts had deprived the defendant of a fair trial through excessive questioning[1] undoubtedly alerted the Appellate Division here to the nature of Daye's claims. No such special circumstance was shown to exist in *Johnson*. Therefore, I do not find *Johnson* an obstacle to federal court review.

I cannot agree, however, with Judge Pollack's conclusion that Daye had a fair trial. It is undisputed that the trial judge continually thrust himself into the examination of witnesses. The issue is whether he confined himself to the clarification of ambiguities or whether he abandoned his role as judge for that of prosecuting attorney. A close examination of the testimony of the state's witnesses, particularly the four victims who identified Daye, and of the testimony of Daye himself, leaves no doubt that the trial judge participated in such a manner that the jury must have concluded that the court was on the side of the prosecution and believed the defendant to be guilty.

## II.

### WILLIAM WRIGHT

William Wright testified that on March 19, 1974, he was at the E & D Luncheonette, sitting in the last booth, facing the door. While he was eating, someone, whom he later identified as Daye, came to use the telephone. At this point, the trial judge interrupted the prosecutor to elicit from

---

1. Prior to Daye's appeal to the Appellate Division, Judge Roberts had been reversed for excessive interference in the conduct of the trial on three occasions. *People v. Tartaglia*, 35 N.Y.2d 918, 364 N.Y.S.2d 901, 324 N.E.2d 368 (1974); *People v. Kelly*, 65 A.D.2d 686, 409

Wright that Stanback was using the phone and that Wright knew Stanback.

The prosecutor then asked Wright to narrate what had occurred. Wright stated that, when he began eating his lunch, the friend with whom he was sitting said something to him. Wright turned around and a gun went off. The judge again interrupted and asked Wright whether he had seen a man with a gun, where this man was and whether anyone was with the man.

The Assistant District Attorney resumed and asked who was using the telephone. When Wright replied, "Ike," the judge took over again.

The Court: Ike.

So you saw Ike and you saw this man?

The Witness: Yes, I did.

The Court: The man had a gun?

The Witness: Yes, sir.

The Court: They were both by the telephone?

The Witness: Yes.

The Court: All right.

Then, when the prosecutor asked about the relative positions of the two people standing near the telephone, the judge came in again:

Q [by the prosecutor]. Now, what I'd like you to do, with the Court's permission, is indicate by demonstrating with the court officer standing next to you how Ike was standing and the man was standing.

The Court: Assume that the telephone is against that wall. Use the wall as the wall on which the telephone is located.

A [by Wright]. Like this. (Indicating.)

The Court: In other words, Ike the cook was standing by the wall?

The Witness: Right.

The Court: The defendant—withdrawn. A man with a gun.

Mr. Russo [defense counsel]: Your Honor, excuse me.

The Court: I struck it.

Mr. Russo: I have an application.

The Court: What?

Mr. Russo: Based on the Court's statement.

The Court: I said "a man." I struck what I said.

Mr. Russo: I'll make my application later.

The Court: All right.

You say a man with a gun was standing behind him, right?

The Witness: Right.

The Court: The record should indicate that the right hand—did the right hand have a gun?

The Witness: Right.

The Court: The right hand had a gun and it was against the right side, right?

The Witness: Right.

The Court: And the left hand was as you have it, was on the left front?

The Witness: Correct.

The Court: Over the left shoulder and on the left front with the fingers pointing downward on the left side of the individual who was at the phone who[m] you have identified as Ike.

The Witness: Right.

The Court: All right.

In further questioning by the prosecutor, Wright testified that Daye announced a stick-up and Wright attempted to secret some of his money in his shoe. When defense counsel objected to Wright's saying what he was trying to do, the court again broke in.

The Court: He looked in your direction?

The Witness: Yes, he did.

The Court: After he looked in your direction, what did he do and say?

---

N.Y.S.2d 730 (1978); *People v. Ellis*, 62 A.D.2d 469, 404 N.Y.S.2d 862 (1978). Since then, he has been reversed twice more. *People v. Yut Wai Tom*, 53 N.Y.2d 44, 439 N.Y.S.2d 896, 422 N.E.2d 556 (1981); *People v. Mees*, 47 N.Y.2d 997, 420 N.Y.S.2d 214, 394 N.E.2d 283 (1979). In four other cases, the Appellate Division has criticized Judge Roberts's conduct, but found

that it did not deprive the defendant of a fair trial. *People v. Biondolillo*, 63 A.D.2d 610, 404 N.Y.S.2d 864 (1978); *People v. Ohlstein*, 54 A.D.2d 109, 387 N.Y.S.2d 860 (1976); *People v. Williams*, 52 A.D.2d 540, 382 N.Y.S.2d 86 (1976); *People v. Kee*, 45 A.D.2d 704, 357 N.Y.S.2d 81 (1974).

**1162**

The Witness: He pointed the gun at me and said, hey, I'll kill you if you move. I said, I'm just trying to get the money. I put the money on the table and he came back and got it.

The Court: You put all the money on the table?

The Witness: Yes, sir.

The Court: How much was it?

The Witness: $250.

When Wright testified that Daye collected money from the restaurant patrons, the court interrupted to ask, "Did he always exhibit the gun?", eliciting an affirmative response.

Wright then testified that an old man entered the luncheonette. After sustaining an objection to a bit of speculative testimony, the court asked:

. . . What did the old man do?

The Witness: Well, he sit him down in a chair and he pounded him in the head with the butt of the gun two or three times maybe.

The Court: You saw the man with the gun hit the elderly man on the head with the gun?

The Witness: Exactly. After that he collected a few more or whatever money he was picking up and then he said, well, that's it, let's go, and he was out the door.

The Court: He went out the same door?

The Witness: The same door, yes.

The Court: Leading to the sidewalk?

The Witness: Yes. That's correct.

Then, after the prosecutor asked his first question about the gun used in the robbery, the court took over:

[The Prosecutor]: Now, would you be able to describe the gun; what did the gun look like?

A. The gun is a nickle plated .32 automatic with black handles.

The Court: Nickle plated?

The Witness: .32 automatic.

The Court: Black?

The Witness: The handles were black.

Next, the prosecutor elicited that the robber's hand was bleeding. He then asked whether the robber said anything about his hand.

A. Yeah. Well, sometime during the robbery he said, you all made me hurt my hand or something like that. . . .

The Court: He said what?

The Witness: He said you made me hurt my hand and I'm going to kill all of you.

The prosecutor then asked about appellant's conversation with others in the luncheonette, and the court again spoke up:

[The Prosecutor]: What was [the thief] doing with [the gun]?

A. He was pointing it at people, just pointing like this. (Indicating.)

The Court: Indicating a movement of the hand right to left, left to right.

The Witness: Yes, that's correct.

[The Prosecutor]: Did he have any words with the lady behind the counter, the man who had this gun?

A. Yes, he did.

Q. What did he say to her?

The Court: Do you know her name?

The Witness: No, I don't. I think it was Dorothy. I think.

The Court: You think it was Dorothy?

The Witness: I think it was.

The Court: Is she one of the owners of the place?

The Witness: She was a waitress.

The Court: She was a waitress?

The Witness: Right. He just pointed the gun at her and said, give me that money or I'm going to kill you.

Q [by the prosecutor]. Approximately how many people were inside the luncheonette; do you remember?

A. From 12 to 14 people.

The Court: Is that including yourself?

The Witness: Yes.

The Court: And including the person with the gun as well?

The Witness: Yeah, I'd say. That's an approximation.

The Court: About 14 or 14 [sic] people including the people that worked there, the deceased, the person with the gun and yourself, correct?

The Witness: Yes.

After Wright then identified Daye as the man with the gun, the judge intervened:

Q [by the prosecutor]. Mr. Wright, I want you to look around this courtroom and tell me if you're able to see that or identify that who[m] you see in the courtroom?

A. Yes.

Q. Will you point him out, please?

The Court: Indicating the defendant?

Mr. Russo: Yes, I'll concede that the witness has indicated the defendant who is the only black man sitting in the well of the courtroom at the counsel table.

The Court: Any question about that; is that the man?

The Witness: No doubt.

The Court: No doubt in your mind?

The Witness: No.

The prosecutor then inquired whether Daye was alone or accompanied, the court again took up the questioning:

Q. And during the time that this defendant was conducting that robbery after he shot Issac Stanback, was there anybody else assisting him in the robbery, as far as you know.

A. Not to my knowledge.

The Court: He was the only one with a gun that you saw?

The Witness: That's correct.

The Court: He was the only one taking money from the various patrons in the restaurant?

The Witness: That's correct.

In response to the prosecutor's inquiry, Wright said that an employee of the restaurant gave Daye a tray of money. The prosecutor then rested, but the judge again followed up:

The Court: You can tell us exactly what he said.

The Witness: He said, "Bitch, give me that money."

Mr. Kelton [the Assistant District Attorney]: I have no further questions.

The Court: Did he take the money out of the tray?

The Witness: Yes, he did.

The Court: Did you see what he did with the money?

The Witness: He put it in his pocket. I think he put it in his jacket pocket.

The Court: Was it paper money?

The Witness: Yes.

On cross-examination, defense counsel elicited that, in the more than two years between the day of the crime and the trial, Wright had had no observation of appellant. The court intervened:

The Court: Can you make an identification?

The Witness: Could I make an identification?

Mr. Russo: I object to that question.

The Court: Overruled.

Can you make an identification of the person who killed Isaac Stanback in the luncheonette?

The Witness: Yes.

The Court: And who is the person that killed him?

The Witness: This guy right here.

The Court: Indicating the defendant.

Mr. Russo: Objection is noted, your Honor.

Later, counsel inquired of Wright whether he knew of the approximate locations in the courtroom of the various trial participants. His purpose was to show that the witness identified Daye because Daye was sitting in the defendant's seat, and not because the witness remembered Daye. Again, the judge interrupted counsel's examination:

The Court: Do you know the man who did the shooting in the restaurant?

The Witness: Yes, sir.

The Court: Who is it?

The Witness: This guy sitting right here. (Indicating.)

The Court: Indicating the defendant.

Defense counsel tried once more to discredit this witness's identification, but again was frustrated by the court's intervention:

Q [by defense counsel]. You knew where [in the courtroom] to look, did you not?

Mr. Kelton: Objection. Asked and answered.

A [by the witness]. If he was sitting in the back of the courtroom it would be the same thing.

The Court [to the prosecutor]: You have no objection to that?

Mr. Kelton: No, not to that.

The Court: You withdraw your objection?

Mr. Kelton: Yes.

The Court: All right.

Q [by defense counsel]. Mr. Wright, he was the only male negro sitting in the well of the courtroom when you made your identification; isn't that correct?

The Court: I don't know whether he knows what the well of the courtroom is, Mr. Russo.

Q [by defense counsel]. This, Mr. Wright, is the well of the courtroom. (Indicating.)

A. Yes.

Q. And he was the only male negro sitting in the well of the courtroom on Friday when you made your identification, isn't that correct?

A. That's correct.

Q. And you knew where to look when Mr. Kelton asked you to look around the courtroom, isn't that correct?

The Court: Did you know where to look? Did you know where to look, whether to look at a certain table or to look in the spectators or to look at the jury box or to look over there; did you know where to look?

The Witness: Your Honor, when I came in, when I saw I knew that's the man. Why should I look all around the courtroom. I knew where he was.

The Court: Why did you know it was him?

Mr. Russo: Your Honor, I object to the Court's. . . .

The Court: Overruled, counsel.

How did you know it was him based on the fact he was sitting there or because you knew him?

The Witness: Because I knew it was him.

Mr. Russo: Your Honor, I move for a mistrial. I have no further questions.

## JUANITA GIBBS

Next, the state called Juanita Gibbs, who, in addition to relating the details of the shooting of Stanback and the robbery at gunpoint by Daye, told of following Daye and advising the police of Daye's flight into 160 West 142nd Street.

Gibbs testified that, after she heard the shot, she heard Daye say that he was going to kill everyone in the restaurant, that he had shot his own fingers and that he wanted money. When she testified that Daye kept waving a gun around, the judge noted "indicating a movement left and right." The prosecutor then asked Gibbs about the clothing worn by appellant, and the court intervened:

A [by Gibbs]. He had on a black corduroy coat, short coat jacket.

The Court: Short coat?

The Witness: Yeah. Not a long coat.

The Court: Up to the waist?

The Witness: Yes. A black corduroy.

Show a weapon, People's Exhibit 2, Gibbs identified it as the gun used in the crime, and explained that Daye came forward after taking money from the patrons sitting in the rear booths. The court had her reconfirm. "You saw him take some money from the last booth in the back?"

Gibbs testified that appellant kept saying that he should kill everyone. Emphasis was placed on this testimony by the court's inquiry, "He kept repeating it?"

Gibbs then explained that, during the robbery, a man came into the restaurant and that appellant hit him. The judge interrupted to ask: "What did he hit [the man] with? . . . What happened? What did the man do?" After counsel's objection was overruled, the judge continued:

The Court: Overruled. What if anything did he do with the gun? What did he do with the gun?

The Witness: He pulled the trigger and it wouldn't fire.

The Court: What happened?

The Witness: Nothing happened.

The Court: Did you hear a click?

The Witness: Yes, I did.

The Court: On how many occasions did you hear that click?

The Witness: Only once that I can remember.

The Court: Tell me and the jury what occasioned that click. What brought it about? What happened?

The Witness: After he had realized he had hurt himself—

Mr. Russo: Objection.

The Witness: —He got very upset.

Mr. Russo: Objection. I ask that be stricken.

The Court: Strike it.

Just tell us what happened. Just tell us what he said and did.

The Witness: He said, "I should kill every mother fucker in here. I shot my fingers off. I shot my finger."

The Court: Then what happened? Then what did he do?

The Witness: He came down the aisle there with the gun, and he was very upset about hurting himself.

Mr. Russo: Objection.

The Court: Overruled.

What did he do?

The Witness: He pulled the trigger.

The Court: And you heard a click?

The Witness: Yes.

The prosecutor next asked the witness what she had told the police officers when she returned to the restaurant. The judge impatiently asked counsel if he wanted to object:

A. I told them that—

The Court: One moment. Do you object?

[defense counsel]: Objection.

The Court: I can't object for you, Mr. Russo.

[defense counsel]: She's answering quite fast.

The Court: She's not answering that fast.

[defense counsel]: Note my objection.

The Court: Not answering fast enough that I can't catch it.

When the prosecutor again focused on the shooting of Stanback, the court took over:

Q. [by the prosecutor]. Mrs. Gibbs, you said that after the defendant shot the cook, Mr. Stanback, Mr. Stanback fell someplace.

A. He fell in the doorway right over—he was trying to go back to the kitchen but he didn't make it, so he fell between the other steps.

Q. Do you see the area indicating the doorway or where the doorway would be in the luncheonette?

A. Yes.

The Court: The doorway to the kitchen?

The Witness: Yes, right in here.

The Court: Indicating the area which is marked by you which means up, which indicates a step and a landing leading to the door which in turn leads to the kitchen?

The Witness: Right.

Q [by the prosecutor]. Is that where Mr. Stanback fell?

A. That's where he fell.

The Court: Right on the landing?

The Witness: Right across the steps. They had little steps like this.

The Court: He landed right across the steps?

The Witness: Right across it.

The Court: Face—

The Witness: Face down.

The Court: Head pointing where?

The Witness: To the floor.

The Court: Was it toward the kitchen—

The Witness: I didn't get that close. I could just see—

The Court: He was just lying on the ground over the step.

The Witness: Right.

On cross-examination, counsel sought to impeach the reliability of Gibbs's identification of Daye as the robber, and inquired what description she had given the police at the time of the crime two years previously. Counsel asked:

Q. Did you say anything about whether he was wearing glasses?

A. No, I did not. That was not asked.

Q. It was not asked?

A. No.

Q. The description that you gave—

The judge interrupted in the middle of counsel's question:

The Court: Was the man you saw in the restaurant wearing glasses?

The Witness: Not that I can remember.

Having testified that she followed Daye out of the restaurant, Gibbs was asked on redirect examination whether, as she followed Daye, she saw anything in his hand. She testified that she saw a pistol, and the Assistant District Attorney terminated his examination. The judge, nonetheless, continued the questioning:

The Court: You saw a pistol in his hand as he was walking toward 142nd Street?

The Witness: Yes, Your Honor.

The Court: How was he walking?

The Witness: He was running.

The Court: He was running?

The Witness: Uh huh.

The Court: You're excused.

At that point, and out of the jurors' presence, defense counsel objected to a smile on the judge's face in response to one of Gibbs's answers, and requested a mistrial. The judge denied both that he was smiling and the application; nonetheless he instructed the jurors that he had no opinion on the case.

## DAVID MILLER

David Miller identified Daye and described the clothing that Daye wore at the luncheonette—a black corduroy jacket, green turtleneck sweater, grey, double-knit pants with a burgundy stripe, and sneakers. He described appellant's entrance and the shooting of Stanback. As Miller was reciting Daye's demands for money, the judge intervened:

[The witness]: . . . Then he pointed the weapon to her and you could see his finger moving, trying to squeeze off a round or pull the trigger.

The Court: Did you hear noise?

The Witness: No sir, there was no noise.

The Court: Did you hear him say, "I'll blow you away" is that the phrase or is that the sum and substance of what he said?

The Witness: In essence. I can't repeat what he said verbatim, it's been two years.

The Court: You're just giving us what he said in general.

The Witness: Yes.

The Court: Did he use any obscenities at all?

The Witness: At one point, yes, especially when he said "I hurt my hand, I should shoot every . . ."—do I just go on?

The Court: You can use the words.

The Witness: I hurt my hand. I should shoot every mother fucker in here. You've made me hurt my hand, I should shoot every mother fucker in here.

The prosecutor then inquired of Miller whether anyone assisted appellant in the robbery. Miller replied that there was no one else active. Then the judge began to question the witness:

The Court: Anybody else collecting money?

The Witness: No, sir, not that I saw.

The Court: Anybody else exhibit a weapon?

The Witness: No, sir, not that I saw.

The Court: Anybody else giving commands to place the money on the table?

The Witness: No, sir.

Miller then testified about the search by the police in a nearby apartment building. He said the police found a clip from a .32 caliber automatic weapon in the hallway of

what he believed was the third floor. In an apartment on the next floor, Miller recognized a young man he had seen in the restaurant. He recalled that Daye had put his hand on the young man's shoulder and that the young man laughed. He also testified that "one policeman looked out the window and they found the defendant hanging out the window." Defense counsel objected, and the judge took over the questioning:

The Court: Did you see this?

The Witness: I saw them pull the man in.

The Court: You saw the police officers by a window.

The Witness: I saw the police officers by a window.

The Court: What did you see the police officers do?

The Witness: Then I saw the police officers reach down and pull the man bodily back in the window.

The Court: He was outside the window and you saw him pull somebody back from outside the window; is that correct?

The Witness: Yes.

The Court: Who's the man you saw them pull?

The Witness: The defendant sitting over there. (Indicating.)

When the prosecutor requested a moment to check his notes, because he was "just about finished," the court once again continued questioning:

The Court: What was he wearing then, do you recall?

The Witness: The same thing, other than the coat. He didn't have on a coat.

The Court: He didn't have the black—

The Witness: Black corduroy coat. He had on the turtle neck sweater, the trousers and the sneakers, yes.

The Court: He had everything on but the black corduroy coat?

The Witness: Yes, sir.

The Court: He had on the green turtle neck sweater—

The Witness: Green turtle neck sweater.

The Court: And the pants with the burgundy stripes?

The Witness: Yes, sir.

The Court: And the sneakers?

The Witness: Yes, sir.

On cross-examination, counsel tried to establish the amount of time which elapsed between the shooting and Miller's arrival at the apartment building. Although Miller understood counsel's question, the court interrupted his answer and began its own examination:

The Court: Between the shooting—

Mr. Russo [*sic*]: The shooting and the time I arrived at the building.

The Court: You are not talking about when the defendant left the restaurant. You are talking about the time of the shooting—

The Witness: And the time we arrived at the building.

The Court: Arrived at the building.

Q [by defense counsel]. Arrived at the building, right?

The Court: From the time you first observed the shot at the telephone—

The Witness: Until I reached the building itself.

The Court: Yes.

The Witness: I would say a half an hour.

Q [by defense counsel]. Okay.

And how long was the man with the gun in the restaurant that you recall?

A. Approximately ten, fifteen minutes, I believe.

Q. Now, this woman that you called Blondie.

A. Yes, sir.

The Court: So it would be some fifteen minutes after the defendant left the restaurant that you arrived at the building?

If it was thirty minutes from the time of the shooting—

The Witness: Yes.

The Court: That's when you first observed the defendant?

The Witness: Right.

The Court: He was in the restaurant some fifteen minutes thereafter and you

were at the building some thirty minutes after the shooting—

The Witness: So approximately fifteen minutes.

The Court: Fifteen minutes after the defendant left the restaurant?

The Witness: Yes, sir.

Later during Miller's cross-examination, the court interrupted to ask the witness which window had been the one at which appellant was found. When counsel began to ask his next question, the witness asked for permission to clarify his answer, and the judge said, "Certainly". Shortly, thereafter, the judge interrupted again to ask questions on this subject.

## DOROTHY TAYLOR

Dorothy Taylor, who was working at the restaurant as co-owner, testified that she heard a loud bang and saw Stanback lean against the air-conditioner. She observed Daye, whom she identified, and saw him reach into Stanback's pocket and remove his wallet. Daye next demanded all the money, and started to pull the trigger of his gun. The judge asked, "When he pulled the trigger, did you hear any noise?"

The prosecutor then asked Taylor about the gun, and the judge took over:

Q [by the prosecutor]. Do you remember what the gun looked like?

A. It was a very shiny gun. It's vividly in my mind because I kept looking at it. It was a shiny gun. I guess about that size. (Indicating.)

The Court: Indicating about six, seven inches.

Q. Now, after Mr. Stanback was shot by the defendant did you see what Mr. Stanback did or where he went?

The Court: By "shiny" do you mean it was sort of like chrome or nickle plated?

The Witness: Yes. It was like silver.

The Court: Like silver.

The Witness: Yeah.

Q [by the prosecutor]. Can you look at this exhibit please, People's 2, Mrs. Taylor?

(Exhibit shown to the witness.)

A. That looks exactly like it.

The Court: It looks exactly like that, you say?

The Witness: Yes, it looks like it.

The prosecutor began inquiry about two others who might have been acting with Daye. Counsel objected to the admission of possibly hearsay testimony, and the court took over questioning:

[The Court] . . . Did they do anything; did they talk to the defendant?

The Witness: Yes.

The Court: Did the defendant answer what they had to say?

The Witness: No.

The Court: After they spoke to the defendant did the defendant do anything in response to what they had to say; just yes or no?

The Witness: No.

The Court: He did not.

The Witness: Well, he started picking up the money on the counter.

The Court: All right. What did they say prior to the time he started picking up the money on the counter; what did they say to him?

The Witness: They told him, they said, man, don't kill anybody, just get the money, just take the money.

The Court: And he picked up the money?

The Witness: Yes.

The Court: I'm going to permit it.

On cross-examination, counsel sought to test Taylor's memory concerning the two boys about whom she had given testimony. The judge interrupted counsel:

Q [by defense counsel]. You have no recollection as to what either of them was wearing?

A. No, I don't.

The Court: Did either one of them point a gun at you, Mrs. Taylor?

The Witness: You mean of the two?

The Court: Of those two boys.

The Witness: No, no, they didn't.

The Court: Either one pick up any money off the counter?

The Witness: I didn't see them pick up any money, no.

The Court: Either one of them threaten to kill you?

The Witness: No.

The Court: Next question.

Mr. Russo: May I continue?

The Court: Yes.

Defense counsel attempted to show that Taylor's testimony concerning identification was faulty, and asked her about her prior statements. Taylor testified that she made a statement to the detective and described the robber as a black man, albeit "ashy," with a "modern Afro," wearing a black leather jacket. She said that the robber did not have a big Afro, but "similar to what he's wearing now." As if to emphasize the point, the judge asked: "Similar to what you see on the defendant's head at this time?"

After counsel asked whether Taylor had participated in any pretrial identification procedures, the judge took over:

Is it fair to say that since March 19, 1974, the first time that you have ever viewed the person who you say shot and killed Isaac Stanback is in this courtroom today?

The Witness: This is the first time, yes.

The Court: Are you sure that the defendant whom you see in this courtroom is the individual you say shot Mr. Stanback and who robbed you at gun point at the counter?

The Witness: I could never forget the face because they way he pulled the trigger on my stomach. He kept trying to pull the trigger. I could never forget that face.

Ten other witnesses called by the state also ran the gamut of the judge's curiosity throughout their testimony:

Clemens J. Barry, a patrolman who photographed the luncheonette the day of the shooting, was questioned on 5 of the 6 pages of his testimony.

Police officer Rodney Addison, on radio patrol, who took Stanback to the hospital where he died shortly after arrival; his testimony was interrupted by the court on 8 of 14 pages.

Beatrice Espita, was a waitress at the restaurant. Her testimony covers 24 pages, 20 of which record the trial judge's interruptions.

Edna Ince, part owner who was present during the shooting. On 6 of the 9 pages of her testimony the trial judge interrupted.

Dr. Lorenzo Bogolan, was called to testify that he removed a bullet from Daye's broken finger at Metropolitan Hospital to which Daye was taken by police on March 19th. The judge interrupted and questioned Dr. Bogolan on 21 of the 23 pages recording his evidence. On cross-examination, counsel, trying to establish an intoxication defense, offered into evidence a hospital report in which the admitting doctor diagnosed Daye as suffering from a drug overdose as well as a finger wound. The court undermined that defense by eliciting from Dr. Bogolan the response that "that diagnosis was unwarranted." The court then underlined the weakness of the defense theory:

The Court: Unjustified and not in accord with your observation and examination of the patient William Daye?

The Witness: That's true.

The Court: Do you offer it in evidence, in any event?

[defense counsel]: I still offer that limited portion.

The Court: You offer that limited portion for what it's worth, it's received.

Police officer Daniel Collins, on police radio patrol responded to a call and subsequently went to 160 West 142nd Street where he found a gun clip which contained a bullet, and later saw Daye emerge from a window and lower himself down a drainpipe. The 30 pages of minutes of his testimony show judicial participation on 20 pages.

Detective Benedetto Leotta found a spent shell from a .32 caliber automatic at the

luncheonette, near the telephone, and in apartment 11 he was given a gun and a wallet that he saw a police officer pick up from the floor. On cross-examination, he said he saw Jimmy Flats and Tyrone Scott in a fourth floor apartment and took them into custody, having been informed they had been in the luncheonette during the shooting. Leotta's testimony covering 53 pages was subjected to judicial intervention on 38 pages.

Detective Allen Grant told of seeing Daye climb out a window. He ran down from the roof and pulled Daye through the window and handcuffed him. His 12 pages of testimony was joined by the judge on eight pages.

Detective George Simmons, a police ballistics expert, testified that the bullet removed from Daye's finger and the shell casing had been fired from the gun found in the apartment, and also about the malfunctioning of the gun and its tendency to jam. The judge questioned the witness on 15 of the 18 pages recording his evidence.

Michael Baden, deputy chief medical examiner, testified that Stanback died of a bullet which went 15 inches through his chest. On 12 of the 19 pages of his testimony the court overtly expressed its curiosity.

The remaining witness was Odessa L. Hagler who identified the body of her brother, Isaac Stanback, at the medical examiner's office. Her testimony of less than two pages is the only evidence not interrupted by the trial judge.[2]

### WILLIAM DAYE

Appellant William Daye testified on his own behalf denying any participation in the crime. He went to the E & D Luncheonette and ordered food at the counter. He then went to the back of the restaurant to make a telephone call to his job. Someone was using the telephone, and Daye turned to look for a place to sit down when a man brushed past him. He heard a shot, felt a

pain in his hand, and began cursing. The man passed him again and ordered everybody to put their money on the table. Appellant placed some $40 on the counter, cursing because of the pain in his hand.

Appellant explained that after the man left the restaurant appellant was afraid because he had previously been arrested in the area. In reaction, he ran to a nearby building and, when he heard police coming into the building, went outside on the window sill.

The court then took over the questioning and asked Daye whether he knew Tyrone Scott and James Flats. Appellant said that he knew Scott but did not see him at the luncheonette. Counsel asked to be permitted to conduct his own examination.

The judge participated repeatedly in the cross-examination of appellant, asking him fifty-six questions to the prosecutor's sixty. He asked where in the restaurant appellant had sat and whether the food arrived, challenged appellant as to whether he had testified that he went to sit down, asked whether he had looked at Mr. Stanback after he fell down, inquired how long appellant was in the restaurant, and asked whether he had seen the robber click the gun. Defense counsel objected to the court's interrogation, and the judge withdrew his last question.

Four questions later, the judge interrupted again to inquire concerning appellant's previous testimony that a man had passed by him in the restaurant.

> The Court: You saw a man pass by you?
>
> The Witness: Yes.
>
> The Court: You were standing at [the refrigerator]?
>
> The Witness: Yes.
>
> The Court: The telephone is in front of you, correct?
>
> The Witness: In that area, yes.

\*   \*   \*   \*   \*   \*

---

**2.** The evidence of two witnesses was stipulated and these stipulations were read to the jury in their entirety by the trial judge.

The Court: Will you tell this court and jury if you're standing by [the refrigerator] how a man can pass by you and then shoot the man at the telephone?

Now, you get off that stand and show how that can be done.

When defense counsel asked permission to approach the bench for a sidebar conference, the judge directed counsel to be seated, "allowing [him] an exception." Counsel protested that he wanted to make a record, and the judge told him to "make a note of it." The judge then once again ordered the defendant to show how someone could have "passed by you and shot a man at the telephone. Show the Court how that is done."

After several more questions, the judge asked appellant about what he had heard the man say, what he had seen in the man's hand, and why appellant had run into the apartment building. Defense counsel objected, but the judge continued. Counsel asked for a continuing objection, but the judge pursued his questioning. Before yielding the floor back to the prosecutor, the judge had Daye reaffirm his story that he was an innocent bystander who had been shot and robbed, and yet had fled from the police.

After re-direct examination was completed, the prosecutor had waived re-cross, and appellant had left the witness stand, the judge called him back for "one question." In the ensuing interrogation, the judge elicited from the appellant that on March 19 he was neither drunk nor suffering from a drug overdose.

After appellant left the stand a second time, defense counsel, out of the presence of the jurors, requested a mistrial:

Your Honor, at this time, I would move for the withdrawal of a juror and declaration of a mistrial, based upon the constant interruptions that the Court made during this witness's and other witnesses' examinations and cross examination.

Most specifically, your Honor, with regard to the cross examination of Mr. Daye, I will state for the record that the Court in a noticeably loud and angry voice questioned the defendant about his particular location and, in my opinion, expressed disbelief as to this witness's story and his whereabouts and aspects of the testimony that this witness gave.

### III.

It is a cardinal principle of our adversary system that the trial be conducted by counsel and that the judge should maintain a neutral position at all times. *United States v. Brandt*, 196 F.2d 653, 655–56 (2d Cir. 1952). The jury is to be persuaded by the evidence and its own judgment of the credibility of the witnesses; the weight to be given the testimony and the jury's judgment is to be kept free of any opinion which the trial judge may have regarding relevant evidence or the ultimate question of guilt. *United States v. DeSisto*, 289 F.2d 833, 834 (2d Cir. 1961). It is the paramount duty of the trial judge not only to be impartial; the trial judge must conduct the trial so that the jurors will see that he is impartial. *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir. 1979). Any failure on the part of the trial judge to conduct the trial fairly raises fundamental questions of due process. Obviously all these well established principles apply with special force to a trial where a verdict of guilty carries with it the likelihood of a sentence to life imprisonment, as was here the case.

The state makes two arguments. The first is that Daye suffered no prejudice as the result of the judge's questioning. I think it clear that the judge's persistent interrogation of the witnesses fatally prejudiced the defendant's case. By his questions, the judge unmistakably conveyed to the jury that he was on the side of the prosecution and that he believed in Daye's guilt. He frequently interrupted the prosecutor to elicit evidence favorable to the prosecutor or to emphasize such evidence, and he interrupted defense counsel to cast doubt on a defense theory or a line of evidence. The trial judge's bias was particularly shown during Daye's testimony. He interrupted counsel's direct examination to

introduce a subject that counsel had not touched on—whether Daye knew James Flats—and continued his questioning until counsel objected. A few minutes later, he again interrupted counsel's direct examination to question Daye about his drinking. Finally, the judge repeatedly interrupted the prosecutor's cross-examination of Daye to put a multitude of questions that patently indicated to the jury that he doubted Daye's testimony. Earlier, in flagrant disregard for the requirements of judicial impartiality, the judge had two of the eyewitnesses repeat and reaffirm their identifications of the defendant. To Wright, the judge asked, "Any question about that; is that the man?" Not content with Wright's response that he had "No doubt", the judge repeated, "No doubt in your mind?" to which Wright reaffirmed his identification. The judge later interrupted counsel's cross-examination of Wright to elicit an affirmation that Wright identified Daye because he recognized Daye and not merely because Daye was seated at the defendant's table. Then, during the cross-examination of Taylor, the judge had Taylor reaffirm that she could "never forget" the face of the man who robbed the restaurant, William Daye. In other questions, the judge rehabilitated prosecution witnesses that the defense had impeached, discredited defense evidence, and continually emphasized evidence damaging to the defendant. While no one of these questions would necessarily have conveyed an impression of bias, the cumulative impact was inevitably to convince the jury that the judge believed the defendant to be guilty.[3] That conviction could only have been further reinforced when in summation the prosecutor read to the jury Daye's damaging answers to the questions put by the judge as to where Daye was and what he was doing when he heard the shot. The jurors were surely not surprised when, at the end of the trial, the judge congratulated

them on their service and told them that the evidence established Daye's guilt "not only beyond a reasonable doubt but beyond all conceivable doubt."

Nor, on this record, can we give any weight to the judge's several instructions to the jury to draw no conclusions about the court's opinion from the questions put by the court. Such instructions do not cure the overwhelming impression of bias conveyed by the judge's continuous questioning. *See Querica v. United States*, 289 U.S. 466, 472, 53 S.Ct. 698, 700, 77 L.Ed.2d 1321 (1933).

The state's second argument is that the judge's participation was proper "to clarify testimony and assist the jury in understanding the evidence...." *United States v. DeSisto*, 289 F.2d 833, 834 (2d Cir. 1961). Implicitly, the state suggests that we balance any possible prejudice to Daye against the necessity for the judge's participation. On this record, there was no such need. The need to clarify the facts or issues might arise where the case is complicated, or counsel are unprepared, or the witnesses are deficient. Here, the issues were simple; the evidence was abundant, clear, and direct; and the witnesses were cooperative and articulate. The state and the accused were represented by counsel who were well prepared to develop the relevant facts through testimony and exhibits. The trial judge's interruptions went far beyond any reasonable purpose to clarify the evidence. He never waited to see whether counsel would fully develop a point, or whether there was any ambiguity that needed to be cleared up; instead, he jumped in as a full participant in the examination of witnesses. In one revealing exchange, the court interrupted defense counsel's cross-examination, stating, "I have one question, if I may. You asked a question. I want to ask a question." This eagerness to share equally

---

3. *See, e. g., People v. Ellis*, 62 A.D.2d 469, 404 N.Y.S.2d 862 (1978), where the Appellate Division reversed a conviction for manslaughter, finding that the "excessive questioning and examination of witnesses" by the trial judge had made "him appear to be an advocate rather than an impartial arbiter. It plainly and improperly conveyed to the jury the court's attitude as to the merits of the case as well as the credibility of the witnesses." 62 A.D.2d at 470, 404 N.Y.S.2d 862.

in the interrogation of the witnesses reflected a remarkable lack of impartiality and was totally unjustified in the circumstances of this case.

In view of my conclusion that the petitioner did not have a fair trial I can give no weight to the state's argument that the evidence of Daye's guilt was overwhelming. No matter how strong or how weak the state's evidence may be, under the Constitution the trial given the defendant must be a fair one, and to be fair it must be a trial in which the judge has not acted as an arm of the prosecution and has not indicated by his participation his belief in the defendant's guilt.

Daye did not have the fair trial to which he is entitled by his right to due process of law. He was entitled to trial by jury; what he had was trial by judge. His conviction should not stand. I would direct the district court to grant the petition for a writ of habeas corpus, unless, within a reasonable time, the petitioner is again brought to trial.