Romer T. REESE,* Petitioner,

v.

Raymond R. BARA, Superintendent, Queensboro Correctional Facility, Respondent.

No. 79 Civ. 2089.

United States District Court, S. D. New York.

Sept. 12, 1979.

---

* The petitioner was indicted under the name of Homer Reese, but at the time of sentencing stated his name was Romer Reese.

Romer T. Reese pro se.

Robert Abrams, Atty. Gen. of the State of N. Y., New York City, for respondent; John Martin Weinberg, Asst. Atty. Gen., of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Petitioner is now serving an indeterminate sentence of from five to fifteen years imprisonment imposed following his conviction by a jury of manslaughter in the first degree in the Supreme Court of the State of New York. The judgment of conviction was affirmed by the Appellate Division, First Department, and leave to appeal to the Court of Appeals denied. At the trial and upon appeal he was represented by counsel. Now appearing pro se, he seeks his release by way of a federal writ of habeas corpus. While not clearly articulated, he seeks to void his judgment of convic-

tion upon a claim that he was deprived of a fundamentally fair trial in violation of his right to due process of law under the Fourteenth Amendment. The basis of this claim is (1) error by the trial court in the admission of evidence and (2) error by the trial court in its instructions to the jury.

Preliminarily, it is observed that it is questionable that petitioner has exhausted available state remedies.[1] A study of the brief submitted in support of his state appeal does not indicate that the asserted claims here advanced were presented to the state courts as a denial of his constitutional right to a fair trial; rather, they were asserted as evidentiary errors upon which a reversal of the judgment of conviction and a new trial were sought. The exhaustion requirement is not jurisdictional but reflects a policy of federal-state comity to afford a state the initial opportunity to pass upon and correct alleged violations of a defendant's constitutional rights.[2] However, since this Court in considering petitioner's contentions has already made a word-by-word study of the entire state record consisting of more than 700 pages and concluded that his trial by the State comported with federal constitutional requirements, it is desirable to dispose of petitioner's claim upon the merits. In this circumstance, federal-state comity policy considerations would not be offended. Moreover, the interests of judicial economy would be served. To deny petitioner's application without prejudice to a renewal, portends a state proceeding where if petitioner did not prevail a second habeas corpus petition would most likely be filed in the federal courts.

The petitioner was indicted for murder of his wife, second degree, by inflicting vari- ous knife wounds upon her as a result of which she died. The jury found him guilty of a lesser included crime of manslaughter in the first degree.[3]

In broad outline, the state's evidence developed that petitioner and decedent, Valerie Lowanda Reese ("Dee") had been married but were not living together for several years prior to August 26, 1972 when she met her death; that on several occasions prior thereto petitioner sought to have his estranged wife resume relations with him but she declined to do so; that he had expressed his displeasure and concern with this state of affairs; that about a week or two before the homicide, petitioner remarked to one witness (the witness and the decedent, although not brother and sister, considered and referred to themselves in that relationship), "Looks like your sister don't want to be bothered with me no more"; that about 1:00 p. m. the day decedent died of stab wounds, petitioner was heard to say to her, "I don't know why you don't want to do it." On another occasion shortly before the fatal day, petitioner was heard to say to his wife as he was leaving her apartment, "I'll have the last laugh." Other evidence was offered that the deceased spurned petitioner's attempt to resume their relationship and that he was resentful because of her refusal.

Petitioner's wife, during the period of the foregoing incidents, had been living in a bedroom of a basement apartment of a tenement house in the Bronx, which she shared with three friends, Elaine Davis ("Elaine"), Thomas Rudolph ("Bubba") and Randolph Scott ("Scotty"). During the afternoon of August 26, 1972, Dee, as his wife was called and Elaine Davis, joined in at various times by Bubba, Scotty (deceased at

---

1. 28 U.S.C. § 2254(b) & (c); *Preiser v. Rodriguez*, 411 U.S. 475, 490–91, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973); *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Fay v. Noia*, 372 U.S. 391, 419–20, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); *United States ex rel. Aloi v. Arnold*, 413 F.Supp. 1384 (S.D.N.Y.1976).

2. *Fay v. Noia, supra* note 1, 372 U.S. at 419–20, 83 S.Ct. 822; *Darr v. Burford*, 339 U.S. 200, 204–11, 70 S.Ct. 587, 94 L.Ed. 761 (1950); *Unit- ed States ex rel. Johnson v. Vincent*, 507 F.2d 1309 (2d Cir. 1974), *cert. denied*, 420 U.S. 994, 95 S.Ct. 1435, 43 L.Ed.2d 678 (1975).

3. Petitioner was also found guilty of possession of a knife with intent to use it unlawfully, a misdemeanor; however, at the time of resentence, conviction was set aside as a concurrent crime to the homicide charge.

the time of the trial), Reggie Shell and Geneva Fox, were on the stoop of the tenement engaged in drinking, talking, joking, and at times, some played whist. Shell testified that at about 1:30 in the afternoon of that day, he had seen petitioner and his wife and it appeared that they were having a little misunderstanding. It was on this occasion that petitioner was heard to say to his wife, "I don't know why you don't want to do it." Later that day, at about 7:00 p. m., Shell, while on his way to a nearby store, met petitioner who asked, "Where is your sister?" [Dee], and Shell responded either on the stoop or in the basement apartment where she lives. In a short while, as Shell was returning from the store, a neighbor yelled that his sister was cut up; he ran to her apartment where he saw her lying on the floor all bloodied. From the time of petitioner's inquiry as to where Dee was to the time he was informed that she was "cut up", some 10 or 15 minutes had elapsed.

Elaine Davis testified that Dee had left the group on the stoop in the late afternoon to go to the basement apartment to nap; that soon thereafter, Elaine went to the apartment to go to the bathroom and saw Dee asleep on her bed; that she, Elaine, returned to the stoop where she rejoined Bubba and Scotty; that about 7:30 p. m., petitioner appeared and asked where Dee was and Elaine responded she was downstairs sleeping; that petitioner, who was wearing a shoulder pouch, entered the hallway of the building leading to the basement apartment; that about 25 minutes later, she decided to go to the apartment to eat; that as she was halfway down the flight of steps leading to a courtyard adjacent to the basement apartment, she met petitioner coming up who said, "See you later"; that he was wearing the same pouch that he had when he entered the building; that she continued on her way and when a few steps from the apartment, saw Dee standing at the door bent over and holding her stomach with blood all over her; that from the time she met petitioner on the steps until she saw Dee only seconds had passed; that when she saw Dee bleeding profusely, she screamed "Bubba" who, together with Scotty, came running to the apartment; they placed Dee, who was in a state of collapse on the floor in front of a couch in the living room, applying towels in an effort to staunch the bleeding from the knife wounds in her stomach and arms. Dee, in response to Elaine's inquiry as to what happened, uttered "Homer, Homer." Then almost immediately thereafter, while Elaine was getting towels, Bubba heard her say, "Homer stabbed me." She said nothing further and lapsed into unconsciousness. These witnesses observed no knife or other weapon in the apartment. Elaine, in going from the stoop to the apartment, saw no other person than the petitioner.

The police and an ambulance were summoned and responded promptly. The police officers, after administering first aid, searched the apartment and found no knife. They observed a trail of blood from the threshold of the living room to Dee's bedroom and, in addition to the trail of blood, more blood in another part of her bedroom. Dee was removed to the hospital and was dead on arrival. A more intensive search by the police later that evening and the next day of the apartment and areas adjacent to the premises failed to yield any knife or weapon.

The medical examiner performed an autopsy the next day and found the deceased had sustained four knife wounds, a 3" long incised cut on her left arm, a second incised 3" wound on the left forearm, a 2" incised wound in the left hand palm, and one abdominal wound which had penetrated the right lobe of the liver, severing a major blood vessel. The examiner certified the cause of death as a wound of the abdomen, liver and portal vein. He also found old scars which suggested a previous suicidal attempt. In his opinion, death was inflicted by an assailant rather than self-inflicted.

The State also offered proof that from the time petitioner was seen by Elaine Davis on the stairway leading to the apartment where the deceased was found bleeding to death, he had disappeared from his abode and usual haunts and was not seen,

despite efforts by the police to locate him for questioning, until his arrest in San Francisco ten months later.

The petitioner did not testify. The defense was that Dee had committed suicide. A defense witness testified that earlier on August 26, although she was not entirely sure of the date, the petitioner and Dee, his wife, were in her apartment and that Dee tried to kill herself with a knife because the petitioner said if she didn't stop using drugs he would leave her, and Dee said she didn't want to live without him.

In further support of the defense of suicide by the decedent, the petitioner relied, in part, upon the testimony of the medical examiner who, on cross-examination, testified that although his opinion was that death was inflicted by an assailant, he could not absolutely exclude the possibility that the decedent inflicted the fatal wound upon herself. Upon the foregoing evidence the jury returned the verdict of guilty.

■ While it is true that no one saw petitioner stab his wife, the circumstantial evidence was substantial. Applying the most recent standard of review required of a federal habeas court where a state court judgment of conviction is challenged for constitutional infirmities, clearly a rational trier of fact could readily find that the state established the essential elements of the crime charged beyond a reasonable doubt.[4] Indeed, the force of the evidence was such that one would question whether a trier of fact who came to any conclusion other than guilt beyond a reasonable doubt was rational. Circumstantial evidence is of no less value than direct evidence.[5] Considering the nature and number of wounds, the petitioner's presence on the stairway leading to and from the apartment where the decedent within seconds was found bleeding to death, the absence of any knife in or about the premises, the bag petitioner was wearing in which a knife readily could have been concealed, his statements to and of decedent several weeks prior to her death, and the proof of flight, are most compelling evidence of petitioner's guilt. Nonetheless, petitioner contends that he was deprived of his constitutional right to a fair trial because of the admission in evidence of decedent's volunteered statement, "Homer stabbed me" which, in petitioner's view, "constituted the prosecution's most crucial evidence against" him.

■ Dying declarations have long been recognized as an exception to the hearsay rule. The basic concept underlying the admission in evidence of such declarations is that the

> [M]ind, impressed with the awful idea of approaching dissolution, acts under a sanction equally powerful with that which it is presumed to feel by a solemn appeal to God upon an oath. *Commonwealth v. Roberts*, 108 Mass. 296. Safety in receiving such declarations lies only in the fact that the declarant is so controlled by a belief that his death is certain and imminent that malice, hatred, passion and other feelings of like nature are overwhelmed and banished by it.[6]

In order to qualify for admission in evidence of a declarant's statement, three essential elements are required: (1) that the declarant be in extremis; (2) that he be under a sense of impending death without hope of recovery; and (3) that declarant would, if living, be a competent witness.[7]

■ The elements of an "in extremis" condition and the competency of declarant as a witness are readily satisfied here. As to the former, the decedent died of her

---

4. *Jackson v. Commonwealth of Virginia*, —— U.S. ——, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

5. *Holland v. United States*, 348 U.S. 121, 139–40, 75 S.Ct. 127, 99 L.Ed. 150 (1954); *United States v. Glasser*, 443 F.2d 994, 1006–07 (2d Cir.), *cert. denied*, 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971); *United States v. Bowles*, 428 F.2d 592, 597 (2d Cir.), *cert. denied*, 400 U.S. 928, 91 S.Ct. 193, 27 L.Ed.2d 188 (1970). *Cf.*

*Rogers v. Missouri Pacific R. R.*, 352 U.S. 500, 508 n.17, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957).

6. *People v. Sarzano*, 212 N.Y. 231, 234, 106 N.E. 87, 88 (1914).

7. *Id.* at 234–35, 106 N.E. at 88; *People v. Ludkowitz*, 266 N.Y. 233, 194 N.E. 688 (1935). *See also* Richardson on Evidence (10th ed.) § 307.

wounds within a few minutes after naming petitioner as her assailant. As to the latter element, it is beyond challenge that had she lived she would have been a competent witness as to how she came by her stab wounds. The third element, that she was under a sense of impending death and without hope of recovery, may be inferred from the surrounding circumstances, such as the nature of her wounds and her physical condition.[8] Whether the proof is sufficient to admit in evidence a dying declaration is for determination by the trial judge. The evidence established that among the wounds upon Dee Reese was one in her abdomen which penetrated the liver and severed a major blood vessel—of such severity that death resulted within 15 to 20 minutes after its infliction. This and all the other attendant physical and surrounding circumstances permitted the inference of knowledge of imminent death on the part of the deceased, and, in sum, was sufficient to permit the introduction into evidence of her declaration.

■ Moreover, even were it assumed arguendo that the trial court erred in admitting the statement in evidence, this would not vitiate the judgment of conviction. An alleged error in the admission of evidence in a state court proceeding does not, by itself, present a federal constitutional issue. In general, trial errors in the admission or exclusion of evidence do not rise to the level of constitutional deprivation unless they violate specific constitutional provisions.[9] As this Court stated in a related matter:

Each state is free to adopt its own procedures and rules of evidence in the enforcement of its criminal laws, and these may not be interfered with by the federal courts unless they offend fundamental principles of justice and fair play. It follows that mere errors or mistakes of law committed in the conduct of state criminal trials may not be reviewed by the federal courts; they are empowered to upset a state court judgment of conviction only when the wrong complained of necessarily denied the defendant a fair trial—in short, that the judgment of conviction is void for lack of due process because of the state's "failure to observe that fundamental fairness essential to the very concept of justice." Absent such a showing, the writ of habeas corpus is not available to review errors in petitioner's trial in the admission of evidence . . .[10] (footnotes omitted)

There has been no such showing with respect to the admission in evidence of the challenged statement. It was properly admissible and even if it were improperly received, as indicated above, the independent circumstantial evidence, without the statement "Homer stabbed me," was sufficient to warrant the conviction and there is no basis to support a claim that it denied the petitioner a fair trial.

■ The petitioner next urges that the court's statement, during the course of instructions on how to evaluate the credibility of witnesses, that the People had "to take the witnesses as they found them," and its reference to the implement employed in the stabbing as the "murder weapon," in the light of the fact that the defense was that Dee committed suicide, conveyed to the jury the judge's belief that the defendant was guilty—in sum, it was so prejudicial that he was denied a fair trial. The claim is without substance. Instructing a jury that a prosecution has to take the witnesses as they are is stating a fact. This instruction is usually given where accomplice or informer testimony is offered or witnesses are tendered who may have criminal records or whose mode of life may not conform to accepted community standards. Most of the People's witnesses either were or had

8. *People v. Ludkowitz,* 266 N.Y. 233, 239, 194 N.E. 688, 690 (1935); Richardson on Evidence (10th ed.) § 309; Wigmore on Evidence (3d ed.) § 1412.

9. *United States ex rel. Holliday v. Adams,* 443 F.2d 7 (2d Cir. 1971); *Freeman v. Mabry,* 570 F.2d 813 (8th Cir.), *cert. denied,* 439 U.S. 845, 99 S.Ct. 142, 58 L.Ed.2d 146 (1978).

10. *United States ex rel. Birch v. Fay,* 190 F.Supp. 105, 107 (S.D.N.Y.1961). *See also United States ex rel. Santiago v. Follette,* 298 F.Supp. 973 (S.D.N.Y.1969).

been drug addicts with criminal records; some were under methadone treatment and apparently were given to daily drinking and to a lazy style of life. Citizens are not bereft of their common sense when they serve as jurors. The statement that a prosecution must rely upon the witnesses as they are, whatever their backgrounds, is stating what is already known.[11]

 Equally without merit is the contention that the judge's reference to the "murder weapon" prejudicially influenced the jury or reflected the judge's view that defendant was guilty. Petitioner has culled the phrase out of context. The court's reference was as follows:

> The fact that the knife was not recovered or offered in evidence, does not lessen the probabilities or the responsibility for the use of it. If you find, beyond a reasonable doubt, that the knife was used, was so used, then I charge you that the production of the murder weapon, the knife in this case, is no manner, shape or form a necessary element of the proof of a crime.

Viewed in context, the reference was entirely proper. Clearly, if the jury found beyond a reasonable doubt that a knife was used in the slaying of the deceased, then, obviously, it was the "murder weapon." The reference affords no basis for a claim of undue prejudice which impinged upon the petitioner's right to a fair trial. The court's charge emphasized the presumption of innocence in his favor and the burden upon the People to establish guilt beyond a reasonable doubt.

 Finally, petitioner's claim that considering the non-violent character of his

prior criminal record and that following the sentence he developed a coronary condition requiring hospitalization, the sentence imposed was excessive, also fails. This claim presents no constitutional issue since the sentence imposed was within the limitation of the statute.[12]

The petition is dismissed.

---

**11.** *Cf. Hoffa v. United States,* 385 U.S. 293, 311, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). See also Chief Justice Warren's dissenting opinion:

> In performing its duty to prosecute crime the Government must take the witnesses as it finds them. They may be persons of good, bad, or doubtful credibility, but their testimony may be the only way to establish the facts, leaving it to the jury to determine their credibility. 385 U.S. at 320–21, 87 S.Ct. at 423.

**12.** *Dorszynski v. United States,* 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974); *Gore v.*

*United States,* 357 U.S. 386, 393, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958); *Townsend v. Burke,* 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948); *Blockburger v. United States,* 284 U.S. 299, 305, 52 S.Ct. 180, 76 L.Ed. 306 (1932); *United States v. Wiley,* 519 F.2d 1348, 1351 (2d Cir. 1975), *cert. denied sub nom. James v. United States,* 423 U.S. 1058, 96 S.Ct. 793, 46 L.Ed.2d 648 (1976); *United States v. Tramunti,* 513 F.2d 1087, 1120 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *McGee v. United States,* 462 F.2d 243, 248 (2d Cir. 1972).