STATE OF NEBRASKA, APPELLEE, V. STEVEN JACOB, APPELLANT.
494 N.W.2d 109

Filed January 8, 1993.    No. S-91-109.

John C. Vanderslice for appellant.

Don Stenberg, Attorney General, and J. Kirk Brown for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

## I. STATEMENT OF CASE

Pursuant to verdict, the defendant-appellant, Steven Jacob, was adjudged guilty of two counts of murder in the first degree, in violation of Neb. Rev. Stat. § 28-303 (Reissue 1989), and of two counts of using a firearm to commit a felony, in violation of Neb. Rev. Stat. § 28-1205 (Reissue 1989). He was thereafter sentenced to life imprisonment on each of the murder convictions and to imprisonment for a period of not less than 6⅔ nor more than 20 years on each of the firearm convictions, all sentences to run consecutively. He assigns a number of errors, including the district court's receipt into evidence of certain statements made by one of the victims. Inasmuch as that assignment is in part meritorious, we reverse and remand the cause for retrial without considering the remaining claimed errors.

## II. FACTS

In February 1988, the now 37-year-old Jacob began dating the victim Melody Hopper. Hopper took Jacob to family events and often participated in activities with his mother. Jacob soon began making plans to buy a house and eventually marry Hopper. However, the relationship between the two began to deteriorate sometime in late June or early July 1989, presumably because Hopper had met the other victim, Jim Etherton.

Hopper first encountered Etherton on Mother's Day 1989 when she, her sister, and her sister's husband visited Etherton's brother, a family friend. The two began dating soon thereafter and developed a relationship described as one in which they "cared for each other quite a bit." However, Hopper had not severed all ties with Jacob. Around June 4, 1989, he and his parents were invited to attend the high school graduation of Hopper's son. At the reception which followed, Hopper introduced Jacob as her "fellow."

Later, Jacob discovered that Hopper was seeing another and had gone out of town with him. Jacob began searching for Hopper. Between June 29 and July 4, 1989, he called Hopper's son's fiance, inquiring if she knew where Hopper was. Jacob talked in a much louder and faster voice than the son's fiance had ever heard previously. Also, Jacob called Hopper's sister, inquiring as to Hopper's whereabouts.

Hopper had left with Etherton on a trip to Wyoming and, in the middle of July, moved into Etherton's residence. While watching Etherton and Hopper unload a pickup truck on July 28, 1989, one of Etherton's neighbors noticed Jacob standing by the rear corner of Etherton's house.

Immediately after arriving at her place of work at approximately 1 p.m. on August 1, 1989, Hopper stood impatiently outside her supervisor's office waiting to speak with him. As soon as the supervisor finished visiting with another person in his office, Hopper went in and sat down. She appeared "flushed," "very fidgety," and "visibly upset." The supervisor had never seen Hopper as agitated and angry as she was on that occasion.

Hopper told the supervisor that she had to talk with him and get something off her chest. She then reported that on that morning, August 1, after Etherton had come home from work, the two of them sat down and had coffee and a roll. When they finished, Etherton left again. Shortly thereafter, Hopper heard the door handle rattle and the doorbell ring. Believing it to be Etherton returning, she opened the door, only to find Jacob standing there. Jacob entered the house uninvited and stated that he had come to talk to her about getting back together. He

was very upset and his hands were shaking. Hopper told Jacob that it was too late and that she intended to marry Etherton. Jacob told her that he at least wanted to talk to her and that if she would not do that, he might do something drastic. Hopper had difficulty getting Jacob to leave, having to physically shove him out of the house. After Jacob's departure, Hopper locked all the doors and windows in the house and called Etherton at his place of work to tell him what had happened.

Hopper also reported to Jacob's mother that Jacob had been over to see her that morning, and Jacob admitted such to his mother. During the conversation, Jacob told his mother that he was going on vacation. He also so informed his father shortly after noon on August 1. Jacob appeared to his father to be upset. However, Jacob, who operated his own business, had a reputation as a "workaholic," was overworked, and had been planning to take a vacation for some time. Jacob had first told his mother in late spring of 1989 that he planned on taking a vacation and had so informed his landlord in early July 1989.

Jacob did not disclose his intended destination, mentioning only that he might visit his sister in Chicago. Prior to leaving, Jacob left a note on his parents' kitchen table, making his mother a director of his company. Jacob left on vacation from his business sometime between 2 and 3 p.m.

At approximately 3:45 a.m. on August 2, a coworker of Etherton's, who rented and lived in the basement of Etherton's house, awoke in his bedroom to use the restroom. Upon opening the door on his way there, he noticed glass on the floor and soon realized that the back door was open. Initially, the coworker believed that a cat had broken the glass; however, he then realized that the glass was broken from the outside. At this point, the coworker heard the upstairs floor "squeak." Becoming frightened, he retrieved his .22-caliber pistol from his nightstand and then went to the base of the stairs, where he heard three rapid gunshots. After hearing two to three more shots, two "high pitched" female screams, and a couple more shots, the coworker backed up and stood in the doorway to the restroom. He thereupon heard "another shot or so and then a thump," as if someone or something fell.

Dressed in only his underwear and a T-shirt, the coworker

then ran out the open back door with gun in hand, jumped a chain link fence, and, proceeding on foot, searched for the home of a man he believed to be a fire marshal. The coworker mistakenly went to the house of the presumed fire marshal's next door neighbor.

The coworker began "frantically" ringing the doorbell and beating on the door of the neighbor's home. The neighbor answered the door at approximately 3:50 a.m.; the coworker told him that someone had been shot and to call the police. The neighbor called the emergency number while the coworker remained outside.

Officer Larry Barksdale joined Officer Larry Nelson at the Etherton house at approximately 4 a.m. on August 2. After attempting to make entry through the front door, Barksdale discovered an open door and a window screen lying on the ground. The glass on the inner door was broken out, and the outer door was propped open with a rock. The house was completely dark, and the officers were forced to use their flashlights. Upon entering the house, Barksdale smelled the scent of blood. Both officers smelled the scent of gunpowder.

Nelson and Barksdale began making their trek through the house, soon discovering Etherton's body lying nude in the hallway. After radioing for help, the officers continued their search through the house. A faint voice crying for help was heard, and the officers proceeded into the northeast bedroom, where they found a nude and bleeding Hopper lying under a bed.

An ambulance arrived at the Etherton residence at approximately 4:16 a.m. The emergency medical technicians found Hopper to be alert but confused, combative, and screaming. She had lost blood and was suffering from shock; the ambulance personnel took her to a Lincoln hospital.

The ambulance arrived at the hospital at 4:41 a.m., and Hopper was admitted at 4:44 a.m. in critical condition. At 4:50 a.m., Hopper was intubated by a nurse anesthetist. The tube, which went from a respirator down into Hopper's lungs, blocked the vocal cords and prevented her from speaking. Thus, Hopper was forced to communicate by moving her head. At the time of her admission, Hopper was still anxious and

slightly combative.

The attending physician, Dr. John Cherry, evaluated Hopper's breathing, blood pressure, and circulation and found that Hopper was awake, alert, "intellectually intact," and able to communicate nonverbally. An initial observation by Cherry discovered an entrance wound in Hopper's right flank, an exit wound at the base of her neck, an entrance wound at the right face bone, and an apparent exit wound below the right ear. Damage to Hopper's liver and diaphragm was repaired. Complications arose and it became necessary to remove Hopper's right lung. No brain damage appeared to be present, as Hopper was given 100-percent oxygen as needed.

After surgery, at approximately 9:10 a.m. on August 2, Hopper was placed in the intensive care unit. Although Hopper was nonresponsive immediately after leaving surgery and being placed in intensive care, she soon started to respond to pain and appeared to be intellectually intact. A noon assessment found Hopper to be alert, oriented, calm, and awake.

At 12:10 p.m. on August 2, Hopper was given a small dosage of morphine to relieve pain. The anesthesiologist opined that Hopper was able to receive communications and respond appropriately at 12:15 p.m.

Hopper was visited at approximately 12:30 p.m. by her sister. When the sister first saw Hopper on August 2, Hopper was awake and acknowledged the sister's presence by squeezing the latter's hand. Hopper also shook her head in an affirmative fashion, nodding up and down. The sister inquired whether Hopper knew who "did this to her," to which Hopper shook her head affirmatively. The sister then asked Hopper, "Was it Steve," and, "Steve Jacob," to which Hopper shook her head up and down. This questioning was witnessed by an intensive care nurse. No further questions were asked at this time.

Hopper's sister left to bring others in to witness Hopper's responses. The intensive care nurse informed the sister that trauma patients often answer affirmatively to any question asked of them. In an attempt to ensure reliable responses from Hopper, the intensive care nurse asked Hopper whether there was snow on the ground and whether it was Christmastime. Hopper made eye contact and shook her head negatively to

both questions. The intensive care nurse testified that Hopper appeared oriented, made good eye contact, and was focused.

Hopper's sister, after leaving the intensive care unit, visited with Det. Doug Hansen regarding Hopper's responses. Hansen suggested that additional questioning of Hopper would be necessary. Hansen, as well as a hospital chaplain and Hopper's mother, then went into the unit at approximately 12:30 to 12:40 p.m., while Hopper's sister remained outside. The mother and the chaplain described Hopper as being very alert. The intensive care nurse described Hopper as appearing oriented. Hopper nodded and squeezed her mother's hand when the mother asked if Hopper knew who she was. Hopper was asked if she knew who had done this to her, to which Hopper nodded affirmatively. Hopper's mother then asked if it was Steve and whether it was Steve Jacob. In response to each question, Hopper nodded her head up and down. The chaplain, who had not previously met Hopper, asked Hopper if she knew who he was and whether it was wintertime; Hopper shook her head back and forth in a negative fashion. Hopper also responded to her mother's requests to wiggle specific fingers and toes. According to the anesthesiologist, Hopper was cognizant at 12:40 p.m. on August 2, 1989.

Hopper's sister visited Hopper seven to eight more times on August 2. The sister asked Hopper if she was in any pain, to which Hopper shook her head negatively, as well as whether she wanted her to place a wet washcloth on Hopper's head, to which she replied in the affirmative.

Officer Barksdale questioned Hopper at approximately 4:30 a.m. on August 3, 1989. Barksdale asked if Hopper knew what had happened to her, if she knew she had been shot, and if she knew who shot her. Hopper responded by nodding her head affirmatively. Barksdale then proceeded to ask Hopper if it was Jacob who shot her, to which she nodded her head yes. Hopper was asked if there was anyone else with Jacob, to which she moved her head back and forth indicating no. Hopper responded affirmatively when asked whether she was shot with a gun, whether she crawled under the bed after Jacob shot her, and whether there were a lot of shots fired. Barksdale asked Hopper if she called on the telephone; Hopper paused for a

moment and shrugged her shoulders. Barksdale then asked Hopper if she was going to be okay and if she was feeling better and knew she was safe, to each of which she nodded yes. Barksdale testified that Hopper appeared alert and conscious during his questioning. In the view of the anesthesiologist, Hopper was cognizant at 4:35 a.m. on August 3, the medications given to Hopper do not affect cognition, and the anesthetic administered to her does not affect memory. The anesthesiologist also opined that he has found that patients given morphine are often more cooperative and better able to understand questioning once the pain is relieved.

Cherry testified that Hopper's injury was not survivable. The intensive care nurse was of the opinion that Hopper suffered traumatic internal injuries to such a degree that survival was questionable.

Dr. Bob Bleicher, a pulmonary specialist who was called in to assist Cherry, first examined Hopper at 1:30 p.m. on August 2 and found her to be neurologically intact. In Bleicher's opinion Hopper was mentally alert and able, at around 12:15 p.m. and 12:40 p.m. on August 2 and at 4:35 a.m. on August 3, to give proper and appropriate responses to questioning. Bleicher was also of the view that Hopper realized she "had the ability to die from her injuries at the time that she gave [her statement]." A hospital nurse testified that he did not expect Hopper to survive her injuries.

Sometime between August 2 and August 7, Hopper wrote on a "magic slate" the letters "g" and "l" and possibly "a" and "s" before her sister and the others present realized that Hopper was requesting her eyeglasses.

On the morning of August 7, 1989, Hopper was mentally alert and able to respond to questions. However, she soon began having trouble breathing. At 1:19 p.m. on August 7, she was pronounced dead when, in a state of delirium and confusion, she extubated herself. Although the tube was promptly reinserted and other measures taken, hospital personnel were not able to resuscitate her. The pathologist concluded that Hopper would have died within a matter of minutes regardless of the extubation.

An optometrist had begun treating Hopper in February 1988

for nearsightedness. He testified that according to his records, Hopper began wearing contact lenses in 1966. After examining Hopper's glasses, the optometrist opined that Hopper's unaided vision was 20/300 to 20/400. However, Hopper's daughter testified at trial that in the early morning hours of August 3, while the daughter was standing 15 to 20 feet from Hopper's hospital bed, Hopper motioned with her hands to her daughter to come toward her. Hopper was not wearing her glasses at the time of her daughter's visit; neither is there any evidence that Hopper was wearing glasses when she was shot.

Dr. Beverley Mead, a psychiatrist associated with the Department of Psychiatry serving both the University of Nebraska and Creighton Medical Schools, reviewed the testimony of Hopper's mother and sister, Barksdale, Hansen, treating physicians, nurses, a pathologist, and relevant medical reports. Mead opined that there were many factors that would tend to have some impairment or negative effect on Hopper's cognitive abilities. Mead stated that "there is no question that [Hopper's] ability to communicate was impaired, not only for physical reasons but also because her brain and mind in her condition was not functioning as well as it would in a healthy alert person." However, Mead acknowledged that one "can have accurate statements coming from very seriously impaired people."

## III. ANALYSIS

At issue is the district court's receipt into evidence of Hopper's statement to her supervisor on August 1 and her statements of August 2 and 3 while she was in the hospital. It is argued in this connection not only that the statements are inadmissible hearsay, but that their receipt into evidence compromised Jacob's right to confrontation as guaranteed by the U.S. and Nebraska Constitutions.

### 1. STATEMENT TO SUPERVISOR

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Neb. Rev. Stat. § 27-801(3) (Reissue 1989). The reliability and circumstantial guarantees of trustworthiness of certain

nontestimonial statements have permitted courts to carve out various limited exceptions to the hearsay rule. In the absence of such an exception, hearsay statements are inadmissible. Neb. Rev. Stat. § 27-802 (Reissue 1989).

(a) Nature of Statement

One of these exceptions, commonly referred to as the "excited utterance" exception, excludes from the operation of the hearsay rule statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Neb. Rev. Stat. § 27-803(1) (Reissue 1989); *State v. Smith*, 241 Neb. 311, 488 N.W.2d 33 (1992); *State v. Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990).

The underlying theory of this exception is that circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication. *In re Interest of D.P.Y. and J.L.Y.*, 239 Neb. 647, 477 N.W.2d 573 (1991); *State v. Plant*, 236 Neb. 317, 461 N.W.2d 253 (1990); *In re Interest of R.A. and V.A.*, 225 Neb. 157, 403 N.W.2d 357 (1987), quoting 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence 803-33 (1992).

> "For a statement to qualify as an excited utterance, the following criteria must be established: (1) There must have been a startling event, (2) the statement must relate to the event, and (3) the statement must have been made by the declarant while under the stress of the event. . . . The key requirement is spontaneity, which 'requires a showing the statements were made without time for conscious reflection.' "

*State v. Smith*, 241 Neb. at 316-17, 488 N.W.2d at 37, quoting *In re Interest of D.P.Y. and J.L.Y., supra.*

We have written in the past that the determination as to the admissibility of an excited utterance generally rests within the discretion of the trial court and that the trial court's ruling will not be disturbed on appeal absent an abuse of that discretion. See, e.g., *In re Interest of R.A. and V.A., supra*; *State v. Lee*, 216 Neb. 63, 341 N.W.2d 600 (1983). That statement appears to be an outgrowth of the regrettably overly broad and recently

rejected expression that the admission or exclusion of evidence is a matter left largely to the discretion of the trial court.

We have declared that in proceedings where the statutes embodying the rules of evidence apply, the admission of evidence is controlled by rule and not by judicial discretion, except where judicial discretion is a factor involved in assessing admissibility. *State v. Timmerman*, 240 Neb. 74, 480 N.W.2d 411 (1992); *State v. Schwartz*, 239 Neb. 84, 474 N.W.2d 461 (1991); *State v. Messersmith*, 238 Neb. 924, 473 N.W.2d 83 (1991). Thus, language in cases such as *In re Interest of R.A. and V.A., supra*, and *State v. Lee, supra*, which suggests that the admission of an excited utterance is left to the discretion of the trial court rather than being controlled by § 27-803(1), is overruled.

Having cleared up the scope of our review on this issue, we turn our attention to the record. As summarized earlier, it establishes that Jacob's visit to the Etherton house was a startling event and that Hopper's statements related to that event. The visit frightened Hopper enough to induce her to secure all of the doors and windows in the house after Jacob's departure. Moreover, Hopper called Etherton and Jacob's mother to tell them what had happened. Thus, the record conclusively demonstrates that Hopper was distressed by Jacob's visit and that her statement to her supervisor was directly related to this startling event.

However, it is argued that the statements fail to meet the third prong of the excited utterance test—the contemporaneous requirement. It is asserted that the statement lacked the element of spontaneity necessary to qualify as an excited utterance, for Hopper had ample opportunity to reflect upon the event before communicating it to her supervisor. Therefore, the crucial issue is whether Hopper's statement was made while she was still under the stress of Jacob's visit. See, *State v. Plant, supra*; *State v. Red Feather*, 205 Neb. 734, 289 N.W.2d 768 (1980).

The record is unclear as to the exact time of Jacob's exchange with Hopper at Etherton's house, only revealing that it occurred sometime in the morning, i.e., presumably anytime before 12 noon. Upon arriving at work at approximately 1 p.m. on August 1, 1989, her sales work not requiring her to keep

regular hours, she stood impatiently outside her supervisor's office waiting to speak with him. She appeared flushed, very fidgety, and visibly upset. The supervisor testified that he had never seen Hopper as agitated and angry as she was on August 1.

As this court stated in *State v. Plant*, 236 Neb. at 329, 461 N.W.2d at 264, "[A] declarant's nervous state is relevant to the issue of whether the statement was made by the declarant while under the stress of the event." Wigmore notes that " '[t]he true test in spontaneous exclamations is not when the exclamation was made, but whether under all the circumstances of the particular exclamation the speaker may be considered as speaking under the stress of nervous excitement and shock produced by the act in issue . . . .' " 6 John H. Wigmore, Evidence in Trials at Common Law § 1745 at 193 (James H. Chadbourn rev. 1976). Statements need not be made contemporaneously with the exciting cause but "may be subsequent to it, provided there has not been time for the exciting influence to lose its sway and to be dissipated." *Id.* § 1750 at 203.

In *State v. Plant, supra*, we held that a child's statements 2 days after the stressful event were admissible as excited utterances. In *State v. Red Feather, supra*, wherein the defendant was convicted of first degree sexual assault, we held that statements made by the 7-year-old victim to her treating physician approximately 1 hour after the assault were admissible. See, also, *Starnes v. State*, 148 Neb. 888, 29 N.W.2d 795 (1947) (rape victim's complaints 3 to 4 hours after the offense held admissible as part of the res gestae).

By way of contrast, in *State v. Smith*, 241 Neb. 311, 488 N.W.2d 33 (1992), we held the statements of a sexual assault victim made after she had had time to record the event in her diary did not qualify as an excited utterance, as there had been ample time for the victim to consciously reflect on the event. Likewise, a statement made 2 hours after an alleged rape was, in *State v. Castor*, 193 Neb. 86, 225 N.W.2d 420 (1975), held not to be spontaneous and therefore not part of the res gestae. However, the *Castor* opinion sheds little light on the degree of stress the declarant was under at the time she made the

statement. In *Markel v. Glassmeyer*, 132 Neb. 716, 273 N.W. 33 (1937), we held it to be reversible error to admit into evidence the plaintiff's testimony as to his wife's statement that she had been assaulted. The statement came "some hours" after the assault and miles from the situs of the assault. *Id*. at 719, 273 N.W. at 35. The *Markel* opinion is silent as to whether the declarant had any observable manifestations of stress from the assault. The pre-evidence-code case of *Callahan v. Prewitt*, 141 Neb. 243, 3 N.W.2d 435 (1942), held that a statement made 1 hour after an automobile accident was inadmissible as an "excited utterance." The opinion notes that the statements were "made after [the defendant] had had time to think the matter all over, and to anticipate a possible lawsuit, and certainly he realized the position he was in . . . ." *Id*. at 251, 3 N.W.2d at 438.

These cases set the outer boundary of the excited utterance rule and further emphasize the point that the analysis centers on the facts unique to each particular case. Here it is clear that Hopper exhibited observable manifestations that she made the statement while under the stress of excitement caused by Jacob's visit. The statement was thus an excited utterance.

(b) Right of Confrontation

It is further argued that in any event, admission of the statement violated Jacob's right to confrontation under U.S. Const. amend. VI, as made applicable to the states by U.S. Const. amend. XIV, *Pointer v. Texas*, 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965), and under Neb. Const. art. I, § 11.

U.S. Const. amend. VI provides, in relevant part, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." Neb. Const. art. I, § 11, provides, in relevant part, "In all criminal prosecutions the accused shall have the right . . . to meet the witnesses against him face to face . . . ." We have held that the analysis under article I, § 11, is the same as that under the Sixth Amendment to the U.S. Constitution. *State v. Plant*, 236 Neb. 317, 461 N.W.2d 253 (1990). See *State v. Roy*, 214 Neb. 204, 333 N.W.2d 398 (1983).

We have also written that the mission of the Confrontation

Clauses is to advance practical concern for the accuracy of the truth determination process in criminal trials by assuring that the trier of fact has a satisfactory basis for evaluating the truth of the prior statement. *State v. Palser*, 238 Neb. 193, 469 N.W.2d 753 (1991); *State v. Roy, supra.*

It is obvious that if the Confrontation Clauses were interpreted literally, they would require, on objection, the exclusion of any statement made by a declarant not present at trial; however, the right to confrontation is not absolute. *State v. Plant, supra.* In truth, however, while the clauses limit the use of hearsay testimony, they do permit its use under certain circumstances, despite a defendant's inability to confront the declarant.

Where it is established that the declarant is unavailable, the question becomes "whether the State, as the proponent of evidence presumptively barred by the hearsay rule and the Confrontation Clause, has carried its burden of proving that the [declarant's] statements . . . bore sufficient indicia of reliability to withstand scrutiny under the Clause." *Idaho v. Wright*, 497 U.S. 805, 816, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990). Thus, the use of hearsay testimony does not violate the Confrontation Clauses if the State can demonstrate (1) the unavailability of the declarant and (2) that the declarant's statement bears adequate indicia of reliability.

"Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." *Idaho v. Wright*, 497 U.S. at 815, citing *Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). "Admission under a firmly rooted hearsay exception satisfies the constitutional requirement of reliability because of the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements." *Idaho v. Wright*, 497 U.S. at 817. Accord *White v. Illinois*, ____ U.S. ____, 112 S. Ct. 736, 116 L. Ed. 2d 848 (1992).

Hopper's statement to her supervisor on August 1 is reliable and does not offend the Confrontation Clauses, for the excited utterance exception to the hearsay rule is one deeply rooted in the common law. See, *Stidum v. Trickey*, 881 F.2d 582 (8th Cir. 1989), *cert. denied* 493 U.S. 1087, 110 S. Ct. 1151, 107 L. Ed. 2d

1055 (1990); *Berrisford v. Wood*, 826 F.2d 747 (8th Cir. 1987), *cert. denied* 484 U.S. 1016, 108 S. Ct. 722, 98 L. Ed. 2d 671 (1988); *State v. Plant, supra.*

Consequently, the district court properly received into evidence the statement Hopper made to her supervisor.

## 2. HOSPITAL STATEMENTS

It is next urged that the statements Hopper made in the hospital were inadmissible. The claim is not only that the statements constituted inadmissible hearsay, but that foundation for their admission was lacking inasmuch as Hopper was not asked whether she was wearing her glasses or whether the area was illuminated when she was shot. In short, the contention is that the record does not show whether Hopper saw or otherwise perceived her assailant.

The district court ruled that the statements made August 2 were admissible as dying declarations under Neb. Rev. Stat. § 27-804(2)(b) (Reissue 1989) and under the residual exceptions contained in §§ 27-803(22) and 27-804(2)(e) and that the statement made on August 3 was admissible under the aforesaid residual exceptions.

### (a) Dying Declaration Exception

Section 27-804(2)(b) renders admissible the statement of a declarant who is unavailable as a witness if the statement is made "while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death." Thus, the essential element to the admission of a statement as a dying declaration is that the declarant be conscious of approaching death at the time of the making of the statement.

Dying declarations are to be received with great caution, necessitating a thorough judicial inquiry as to the declarant's sense of impending death. Obviously, a declarant's belief of impending death is best shown by express communication to that effect. However, it is not necessary that a declarant state in specific terms at the time of the making of the statement her or his consciousness of impending death. *Mathews v. State*, 111 Neb. 593, 197 N.W. 602 (1924); *Collins v. State*, 46 Neb. 37, 64 N.W. 432 (1895); *Fitzgerald v. The State*, 11 Neb. 577, 10 N.W.

495 (1881); *Rakes v. The People*, 2 Neb. 157 (1873). A declarant's consciousness of impending death may be established by evidence other than the declarant's own statement. Circumstances surrounding the death may be enough to show consciousness of impending death. See *State v. Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990). See, also, *Reese v. Bara*, 479 F. Supp. 651 (S.D.N.Y. 1979); *Com. v. De Shields*, 335 Pa. Super. 89, 483 A.2d 969 (1984); *State v. Verrett*, 419 So. 2d 455 (La. 1982); *State v. Hamlette*, 302 N.C. 490, 276 S.E.2d 338 (1981).

As Wigmore has noted:

> It has been contended that only the *statements of the declarant himself* could be considered for this purpose; or, less broadly, that the *nature of the injury alone* could not be sufficient, i.e., in effect, that the declarant must have shown in some way by conduct or language that he knew he was going to die. This, however is without good reason. We may avail ourselves of any means of inferring the existence of such knowledge; and, if in a given case the nature of the wound is such that the declarant must have realized his situation, our object is sufficiently attained.

(Emphasis in original.) 5 John H. Wigmore, Evidence in Trials at Common Law § 1442 at 295 (James H. Chadbourn rev. 1974).

Some courts have held that a declarant's sense of impending death may be inferred from the opinions of medical professionals. In *United States v. Mobley*, 421 F.2d 345 (5th Cir. 1970), the victim was severely beaten and shot during the course of a bank robbery. While in the hospital emergency room, the victim gave an account of the robbery. The attending physician had not told the victim that death was imminent, nor had the victim expressed an awareness thereof. The court nonetheless permitted the use of the physician's belief that due to the nature and severity of the injuries, the victim likely knew that his chances for living were " 'very slim' " as the basis for admitting the statement. *Id*. at 348. Quoting *Clyde Mattox v. United States*, 146 U.S. 140, 13 S. Ct. 50, 36 L. Ed. 917 (1892), the *Mobley* court held that a declarant's sense of impending death may be made to appear " 'from the nature and extent of

the wounds inflicted being obviously such that he must have felt or known that he could not survive.' " *Mobley*, 421 F.2d at 347.

Although there is no question that Hopper sustained serious injuries, that at least some of her medical care providers did not expect her to survive, and that at least one physician thought Hopper knew she might die, Hopper responded affirmatively when asked by Barksdale whether she understood she was "going to be okay." Although that last statement was made in the early morning hours of August 3, it raises substantial doubt as to whether Hopper at any time appreciated her impending death.

That being so, none of the statements Hopper made at the hospital qualify as dying declarations.

### (b) Residual Exceptions

However, that determination does not settle whether the statements made at the hospital were otherwise admissible. Section 27-803(22) provides that even though the declarant is available as a witness, a statement not specifically covered by the other exceptions to the hearsay rule enumerated in that statute "but having equivalent circumstantial guarantees of trustworthiness" is nonetheless admissible

> if the court determines that (a) the statement is offered as evidence of a material fact, (b) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and (c) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. A statement may not be admitted under this exception unless the proponent of it makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

Section 27-804(2)(e) provides a like residual exception to the hearsay rule as to a statement made by a declarant who is unavailable as a witness.

While we have said that the residual hearsay exception is to be used rarely and only in exceptional circumstances, *State v. Plant*, 236 Neb. 317, 461 N.W.2d 253 (1990), we have also ruled that where the declarant is dead, the specific exceptions of both §§ 27-803(22) and 27-804(2)(e) are applicable in determining the existence of equivalent circumstantial guarantees of trustworthiness. *State v. Beam*, 206 Neb. 248, 292 N.W.2d 302 (1980).

There is no dispute that the plaintiff-appellee State gave the requisite notice, and it is manifest that Hopper's statements were offered as evidence of a material fact, i.e., by whom was she shot. Furthermore, the record establishes that the statements were more probative on that point than any other evidence the State could procure through reasonable efforts in that, other than the perpetrator, she was the only person who could identify the killer, if anyone could do so. Thus, the critical issue is whether the circumstances surrounding the making of the hearsay statements by Hopper provided the guarantees of trustworthiness comparable to the other hearsay exceptions in the Nebraska Evidence Rules.

At least one jurisdiction, Georgia, has taken the position that where want of knowledge does not appear either from the statement itself or from other evidence in the case, it becomes a question for the jury to determine whether the declaration represented the primary knowledge of the declarant or merely the declarant's opinion. *Wright v. State*, 254 Ga. 484, 330 S.E.2d 358 (1985); *Bland v. State*, 210 Ga. 100, 78 S.E.2d 51 (1953); *Strickland v. State*, 167 Ga. 452, 145 S.E. 879 (1928).

However, the U.S. Supreme Court, in *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), in dealing with admissibility of hearsay in a criminal case, wrote:

[A] statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

Later, in *Idaho v. Wright*, 497 U.S. 805, 820, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990), the U.S. Supreme Court stated,

"We think the 'particularized guarantees of trustworthiness' required for admission under the Confrontation Clause must likewise be drawn from the totality of circumstances that surround the making of the statement *and that render the declarant particularly worthy of belief*" (emphasis supplied), and concluded:

> To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial. . . . A statement made under duress, for example, may happen to be a true statement, but the circumstances under which it is made may provide no basis for supposing that the declarant is particularly likely to be telling the truth—indeed, the circumstances may even be such that the declarant is particularly *un*likely to be telling the truth. In such a case, cross-examination at trial would be highly useful to probe the declarant's state-of-mind when he made the statements; the presence of evidence tending to corroborate the truth of the statement would be no substitute for cross-examination of the declarant at trial.
>
> In short, the use of corroborating evidence to support a hearsay statement's "particularized guarantees of trustworthiness" would permit admission of a presumptively unreliable statement by bootstrapping on the trustworthiness of other evidence at trial, a result we think at odds with the requirement that hearsay evidence admitted under the Confrontation Clause be so trustworthy that cross-examination of the declarant would be of marginal utility.

497 U.S. at 822-23.

Thus, testimonial accuracy and a witness' perception, memory, and narrative ability are practical concerns regarding any hearsay used for conviction of a defendant.

Aside from the several requirements which must be satisfied for admission of a statement under a residual exception, either § 27-803(22) or § 27-804(2)(e), the absolutely basic requirement is the "equivalent circumstantial guarantees of trustworthiness." According to 2 McCormick on Evidence

§ 324 at 362-64 (John W. Strong 4th ed. 1992):

In applying the residual exceptions, the most important issue is whether the statement before the court offers "equivalent circumstantial guarantees of trustworthiness" to those offered by the various other specific hearsay exceptions. In making the admissibility determination, courts frequently employ the technique of comparing the circumstances surrounding the statement at issue to the closest hearsay exception. Courts also focus on particular factors suggesting trustworthiness of those statements. . . .

Among these factors are: whether the declarant had a motivation to speak truthfully or otherwise, whether the statement was under oath, the duration of the time lapse between event and statement, *whether the declarant had firsthand knowledge*, and other factors going to the declarant's credibility.

(Emphasis supplied.) See, also, Michael H. Graham, Handbook of Federal Evidence § 803.24 at 941 (3d ed. 1991) (criteria which court should consider include "assurance of personal knowledge of the declarant of the underlying event").

As expressed in § 27-803(22) and § 27-804(2)(e), "these rules" of evidence, that is, the Nebraska Evidence Rules, as contained in chapter 27 of our statutes, also include Neb. Rev. Stat. §§ 27-104, 27-602, and 27-701 (Reissue 1989).

Section 27-104 in part provides:

(1) Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the judge, subject to the provisions of subsection (2) of this section.

(2) When the relevancy of evidence depends upon the fulfillment of a condition of fact, the judge shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

Section 27-602 provides:

A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has

personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself. This rule is subject to the provisions of section 27-703, relating to opinion testimony by expert witnesses.

Section 27-701 states:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

As stated in 1 McCormick on Evidence § 10 at 37-40 (John W. Strong 4th ed. 1992):

The common law system of proof is exacting in its insistence upon the most reliable sources of information. This policy is apparent in the Opinion rule, the Hearsay rule and the Documentary Originals rule. One of the earliest and most pervasive manifestations of this attitude is the rule requiring that a witness who testifies to a fact which can be perceived by the senses must have had an opportunity to observe, and must have actually observed the fact. The same requirement, in general, is imposed upon declarations coming in under exceptions to the hearsay rule, that is, the declarant must so far as appears have had an opportunity to observe the fact declared.

. . . .

The burden of laying a foundation by showing that the witness had an adequate opportunity to observe is upon the party offering the testimony. . . .

. . . .

One who has no knowledge of a fact except what another has told him cannot, of course, satisfy the present requirement of knowledge from observation.

According to Graham, *supra*, § 602.1 at 392-93, under the rule embodied in § 27-602:

Admissible testimony is limited to matters of which the witness has acquired personal knowledge through any of [the witness'] own senses . . . .

. . . [T]o be admitted pursuant to an exception contained in Rule 803 or 804, the declarant of the extrajudicial statement must also be shown to have personal knowledge as to the matter related.

1 McCormick on Evidence § 53 at 215 states that under the rule stated by § 27-104,

[t]he judge is not, however, eliminated from the picture but divides his responsibility with the jury in the following manner. The judge requires the proponent to bring forward evidence from which the jury could find the existence of the preliminary fact. The opposing party may then bring in disputing evidence. If on all the evidence the judge determines that the jury could not find the existence of the preliminary fact, he excludes the evidence. Otherwise, the question is for the jury.

Thus, whether a witness had the opportunity to observe and did actually observe the subject matter of the witness' testimony is a preliminary question of admissibility determined by a trial court pursuant to § 27-104. Sections 27-602 and 27-701 require that a witness testifying to objective facts must have had means of knowing the facts from the witness' personal observation.

Federal courts, applying Fed. R. Evid. 104(b), have held that a trial court has an obligation to make a rule 104 preliminary determination regarding admissibility before admitting evidence pursuant to the rule found in the federal counterpart to § 27-602. See, *United States v. Davis*, 792 F.2d 1299 (5th Cir. 1986), *cert. denied* 479 U.S. 964, 107 S. Ct. 464, 93 L. Ed. 2d 409 (the proponent of testimony has the burden to show that the testimony represents a witness' personal knowledge); *U.S. v. Burnett*, 890 F.2d 1233, 1240 (D.C. Cir. 1989) (analysis of admissibility under section mirroring § 27-602 "proceeds under the rubric of Federal Rule of Evidence 104"); *M. B. A. F. B. Fed. Credit Union v. Cumis Ins. Soc.*, 681 F.2d 930 (4th Cir. 1982) (evidence is inadmissible under Fed. R. Evid. 602 if a trial court finds that the witness could not have actually perceived or observed the subject matter of the witness' testimony). Accord, *Hallquist v. Local 276, Plumbers & Pipefitters Un.*, 843 F.2d 18 (1st Cir. 1988); *U.S. v. Owens*, 699 F. Supp. 815 (C.D. Cal. 1988), *aff'd* 889 F.2d 913 (9th Cir. 1989).

State courts, applying the counterparts of the rule contained in § 27-602, have held that a rule 104 determination is necessary for a witness' testimony under the rule embodied in § 27-602. E.g., *State v. Ranieri*, 586 A.2d 1094, 1098 (R.I. 1991) ("[i]n deciding whether a witness is competent for purposes of Rule 602, the trial justice must determine whether a witness had a sufficient opportunity to perceive the subject matter about which he is testifying"); *Burlington Northern R. Co. v. Hood*, 802 P.2d 458, 468 (Colo. 1990) ("[t]he personal-knowledge requirement of Rule 602 is 'a specialized application of the provisions of Rule 104(b) on conditional relevancy,' " quoting rule 602 advisory committee's note).

Regarding opinion testimony under § 27-701 from a witness who is not an expert, we excluded a police officer's testimony regarding the speed of automobiles involved in a collision, since the "officer did not observe the collision and his basis of testifying as to unsafe speed cannot be said to be based on any rational perception of the facts." *Belitz v. Suhr*, 208 Neb. 280, 285-86, 303 N.W.2d 284, 288 (1981).

At least one federal court has held that a rule 104 determination by the trial court is necessary before admitting evidence pursuant to Fed. R. Evid. 701. See *U.S. v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992) ("[t]he questions of whether the proffered opinion is rationally based on the witness's knowledge and whether it will be helpful are, like all preconditions to the admissibility of evidence, determinations to be made by the trial judge").

A number of federal courts have held that a declarant's personal knowledge of the facts composing the subject matter of a witness' testimony is a factor in determining whether an out-of-court statement is sufficiently reliable to be admitted under the residual hearsay exception to the Federal Rules of Evidence, which closely mirrors Nebraska's residual exception. See, *U.S. v. Donlon*, 909 F.2d 650, 654 (1st Cir. 1990), *questioned on other grounds, U.S. v. Gomez-Lemos*, 939 F.2d 326 (6th Cir. 1991) (declarant's "testimony concerned matters within her personal knowledge"); *United States v. Marchini*, 797 F.2d 759, 764 (9th Cir. 1986), *cert. denied* 479 U.S. 1085, 107 S. Ct. 1288, 94 L. Ed. 2d 145 (1987), *questioned on other*

*grounds, U.S. v. Gomez-Lemos, supra* (declarant's "testimony related strictly to facts within her observation and personal knowledge"); *United States v. Barlow,* 693 F.2d 954, 962 (6th Cir. 1982), *cert. denied* 461 U.S. 945, 103 S. Ct. 2124, 77 L. Ed. 2d 1304 (1983), *questioned on other grounds, U.S. v. Gomez-Lemos, supra* (declarant's testimony "conveyed information of which she had personal knowledge"); *United States v. Carlson,* 547 F.2d 1346, 1354 (8th Cir. 1976), *cert. denied* 431 U.S. 914, 97 S. Ct. 2174, 53 L. Ed. 2d 224 (1977), *criticized on other grounds, United States v. Thevis,* 665 F.2d 616 (5th Cir. 1982) (declarant "was relating facts . . . of which he possessed firsthand knowledge").

Other courts have reasoned and held that a hearsay statement, as is the situation in any in-court testimony, is inadmissible unless sufficient evidence shows that the declarant has personal knowledge regarding the subject matter of his or her testimony. In other words, the exceptions to the hearsay rule are subject to the conditions imposed for admissibility under other rules of evidence, such as the rule contained in § 27-602 (witness competency and personal knowledge) and § 27-701 (exclusion of opinion evidence and an inference by a nonexpert witness who lacks "perception" for the testimony). For example, in *State v. Adamson,* 136 Ariz. 250, 665 P.2d 972 (1983), *cert. denied* 464 U.S. 865, 104 S. Ct. 204, 78 L. Ed. 2d 178, the Arizona Supreme Court held that it was error to admit hearsay statements regarding the identity of the person who had placed a bomb under the declarant's car, since there was no showing that the declarant had personal knowledge of the bomber's identity. The court found error despite its belief that the statements otherwise qualified as both excited utterances and dying declarations. According to the court:

> There is . . . a general requirement imposed on declarations coming in under all exceptions to the hearsay rule that the declarant, like witnesses, must have had an opportunity to observe or personal knowledge of the fact declared. *State v. Mincey,* 130 Ariz. 389, 636 P.2d 637 (1981); *State v. Dixon,* 107 Ariz. 415, 489 P.2d 225 (1971); Ariz.R.Evid. 602.

*State v. Adamson,* 136 Ariz. at 255, 665 P.2d at 977. According

to the *Adamson* court, the declarant's statements that " 'the mafia was responsible' " and " 'Adamson did it' " should not have been admitted because the statements were not " 'based on events perceived by [the declarant] through one of the physical senses.' " *Id.* (quoting from 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 602[01] (1992)). See, also, *Jones v. State,* 52 Ark. 345, 12 S.W. 704 (1889) (when the declarant could not and, therefore, did not see who shot him, statement identifying the shooter was properly excluded); *State v. Weir,* 569 So. 2d 897, 900 (Fla. App. 1990), *decision quashed, holding approved* 591 So. 2d 593 (Fla. 1991) ("evidence showing the declarant did not accurately observe the facts recounted is allowed, and can be the basis for a court's exclusion of the dying declaration altogether"); 2 McCormick on Evidence § 313 at 331 (John W. Strong 4th ed. 1992) ("[i]f it appears that the declarant did not have adequate opportunity to observe the facts recounted, the declaration will be rejected for lack of firsthand knowledge"); 5 John H. Wigmore, Evidence in Trials at Common Law § 1445(2) at 304 (James H. Chadbourn rev. 1974) ("[t]he declarant must have had actual observation or opportunity for observation of the fact which he relates"). Cf. *Dutton v. Evans,* 400 U.S. 74, 91 S. Ct. 210, 27 L. Ed. 2d 213 (1970) (in reference to the Confrontation Clause, it was inconceivable that cross-examination could have shown that the declarant was not in a position to know whether the defendant participated in the murder which was the subject of the declarant's out-of-court statement).

The failure of anyone to inquire of Hopper whether she saw or otherwise perceived Jacob leaves the record in doubt as to whether the statement that Jacob did the shooting was an expression of Hopper's knowledge or merely an expression of her opinion. What we do know is that the shooting occurred at approximately 3:45 in the morning and that the premises were dark when the police arrived approximately 15 minutes later.

Under these conditions, the "equivalent circumstantial guarantees of trustworthiness" requirement has not been met; it cannot be said that the test of cross-examination would be of marginal utility. Consequently, the statements Hopper made in the hospital on August 2 and 3 are not admissible under the

residual exceptions to the hearsay rule.

## IV. JUDGMENT

Because the district court erroneously admitted into evidence the statements Hopper made in the hospital declaring Jacob to be her assailant, we, as first stated in part I, reverse and remand for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.